IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FUJITSU LIMITED | CIVIL ACTION NO. 1:09-CV-04530 |
| PLAINTIFF, | |
| V. | JUDGE HOLDERMAN |
| | MAGISTRATE JUDGE COLE |
| TELLABS OPERATIONS, INC., TELLABS, INC., AND TELLABS NORTH AMERICA, INC., | |
| DEFENDANTS. | JURY TRIAL DEMANDED |

TELLABS OPERATIONS, INC.'S, TELLABS, INC.'S, AND
TELLABS NORTH AMERICA, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW

<u>**TABLE OF CONTENTS**</u>

I.    **FUJITSU AGREED IT WAS WILLING TO LICENSE THE '737 PATENT ON RAND TERMS.**................................................................................................4

II.   **TELLABS HAS PROVEN THAT FUJITSU'S '737 PATENT'S TECHNOLOGY WAS INCLUDED IN ONE OR MORE OF THE NECESSARY SPECIFICATIONS OF THE STANDARDIZED TECHNOLOGY RECOMMENDED BY THE ITU'S RECOMMENDATION G.692.**..............................................................7

     A.    The G.692 Standard Includes a "Method for Amplifying an Optical Signal" as Recited in Claim 11 of the '737 Patent.................................................8

     B.    The G.692 Standard Includes the Step of "Emitting a Pumping Light Beam" as Recited in the '737 Patent..................................................................9

     C.    The G.692 Standard Includes the Step of "Receiving A First Optical Signal Of A First Wavelength And A Second Optical Signal Of A Second Wavelength" as Recited in the '737 Patent...........................................9

     D.    The G.692 Standard Includes the Step of "Branching The Second Optical Signal From The First Optical Signal For Receipt By A Receiver" as Recited in Claim 11 of the '737 Patent.................................................................11

     E.    The G.692 Standard Includes the Step of "Inputting The Pumping Light Beam And The First Optical Signal To A Rare Earth Element Doped Optical Fiber" as Recited in Claim 11 of the '737 Patent.................................................13

     F.    The 737 Patent's Technology Was Included In The G.692 Standard, And Fujitsu' Arguments Are Irrelevant To This Verdict Form And Contrary To The Law ......14

III.  **FUJITSU BREACHED ITS AGREEMENT THAT IT WAS WILLING TO GRANT A LICENSE TO THE '737 PATENT ON RAND TERMS.** .........................16

     A.    Fujitsu Breached its RAND Agreement by Not Offering to Grant Tellabs a License on RAND Terms for Fujitsu's '737 Patent's Technology.......................16

     B.    Fujitsu Breached its RAND Agreement by an Seeking Injunction. .....................16

     C.    Fujitsu Breached its RAND Agreement by Seeking a Non-RAND Royalty Rate.18

     D.    Fujitsu Breached its RAND Agreement by Seeking Lost Profits.........................19

     E.    Fujitsu Breached its RAND Agreement by Filing a Lawsuit Alleging Infringement of the '737 Patent that Damaged Tellabs' Business. ......................20

     F.    Fujitsu Breached its RAND Agreement by Filing a Lawsuit Alleging Infringement of the '737 Patent that Required Tellabs to Divert Employees' Attention and Time, as Well as Other Resources, to Defending the Lawsuit. ......21

IV.  **TELLABS WOULD HAVE BEEN WILLING TO NEGOTIATE A LICENSE OF FUJITSU'S '737 PATENT'S TECHNOLOGY FROM FUJITSU ON RAND.**........22

V.   **FUJITSU WILLFULLY BREACHED ITS RAND OBLIGATIONS UNDER BOTH CLEAR AND CONVINCING AND PREPONDERANCE STANDARDS.**................24

     A.    Fujitsu was Motivated to Damage Tellabs Because it was Losing Business to Tellabs.....................................................................................................25

     B.    Fujitsu Knew of its RAND Obligations Before it Sued Tellabs and Continued to Believe in those Obligations During the Pendency of this Lawsuit. ....................26

     C.    Fujitsu Planned to Breach its Obligation Instead of Offering Tellabs a License on RAND Terms in Order to Purposefully Damage Tellabs. ....................................28

VI.  **CONCLUSION.** ..........................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp.*,
    604 F.3d 1354 (Fed. Cir. 2010)..................................................................................18

*Apple, Inc. v. Motorola, Inc.*,
    869 F. Supp. 2d 901 (N.D. Ill. 2012), *aff'd in part, rev'd in part and remanded on
    other grounds*, 2012-1548, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014) .......................17, 20

*Apple Inc. v. Motorola Mobility, Inc.*,
    2011 WL 7324582 (W.D. Wis. June 7, 2011) ...........................................................4

*Mallinckrodt, Inc. v. Medipart, Inc.*,
    976 F.2d 700 (Fed. Cir. 1992)...................................................................................18

*Microsoft Corp. v. Motorola, Inc.*,
    854 F. Supp. 2d 993 (W.D. Wash. 2012)............................................................4, 19

*Morrow v. Microsoft Corp.*,
    499 F.3d 1332 (Fed. Cir. 2007)..................................................................................18

*Realtek Semiconductor Corp. v. LSI Corp.*,
    946 F. Supp. 2d 998 (N.D. Cal. 2013) ................................................................4, 17

*Research in Motion Ltd. v. Motorola, Inc.*,
    644 F. Supp. 2d 788 (N.D. Tex. 2008) ......................................................................4

*Zimmerman v. Chicago Bd. of Trade*,
    360 F.3d 612 (7th Cir. 2004) .....................................................................................4

STATUTES

35 U.S.C. § 154...............................................................................................................18

35 U.S.C. § 154(a)(1)......................................................................................................18

OTHER AUTHORITIES

Fed. R. Civ. P. 50(a) .........................................................................................................4

Pursuant to Fed. R. Civ. P. 50(a), Tellabs Operations, Inc., Tellabs, Inc., and Tellabs North America, Inc., (collectively, "Tellabs") respectfully request that the Court enter judgment as a matter of law for Tellabs on each element of Tellabs' RAND defense to Fujitsu's claims of patent infringement because "there is no legally sufficient basis for a reasonable jury to find for" Fujitsu. *Zimmerman v. Chicago Bd. of Trade*, 360 F.3d 612, 623 (7th Cir. 2004).

## I. FUJITSU AGREED IT WAS WILLING TO LICENSE THE '737 PATENT ON RAND TERMS.[1]

In the context of standards setting bodies, patent statements constitute contractual agreements. *See, e.g.*, *Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998, 1003 (N.D. Cal. 2013); *Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 1002 (W.D. Wash. 2012), *Apple Inc. v. Motorola Mobility, Inc.*, 2011 WL 7324582, at *8-10 (W.D. Wis. June 7, 2011), *Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008). To guard against anticompetitive patent hold-up, most SSOs—including the ITU—require patent owners supplying relevant technologies for inclusion in a prospective standard to commit to licensing their technologies on RAND terms. (Simcoe Testimony, Trial Tr. at 361:17-362:4, 369:12-19, 376:14-377:14 (7/18/14).) If patent statements were not binding, it would frustrate the goal of preventing patent hold-up. (*See* Simcoe Testimony, Trial Tr. at 358:24-359:9, 360:17-362:4, 376:14-377:14 (7/18/14).) *See also Microsoft*, 2013 WL 2111217, at *10-11 (noting that "Dr. Richard Schmalensee, acknowledged that 'the RAND commitment and the whole apparatus exists [sic] to deal with hold-up.'"). Thus, participants in SSOs view RAND commitments as binding.

Moreover, patent-holding members of an SSO obtain valuable benefits in return for agreeing to license standard-related patents on RAND terms. In particular, when companies

---

[1] Verdict Form Question 1.

commit to license standard-related patents on RAND terms, other companies are encouraged to adopt and implement the standard, which grows the size of the market, allowing the patent holding company to make more profits by selling more of its product made at a lower cost. (Simcoe Testimony, Trial Tr. at 357:6-24, 358:24-359:9, 366:2-21 (7/18/14).) Indeed, patent holders obtain these benefits even if they agree to give their patented technology away for free. (Simcoe Testimony, Trial Tr. at 365:12-366:1 (7/18/14).)

Tellabs has proven that Fujitsu agreed it was willing to grant a license to Fujitsu's '737 Patent on RAND terms in compliance with the ITU's patent policies. On May 27, 1996, Fujitsu delivered a Patent Statement to the ITU relating the '737 Patent to the G.mcs draft recommendation under consideration within SG15/WP4 Q.25, Q.26, and Q.27. (Joint Ex. 2, at FJIL5653300; Fuji Testimony, Trial Tr. at 158:2-4 (7/17/14).) Draft recommendation G.mcs became the G.692 standard. (Joint Ex. 2, at FJIL5653300; Fuji Testimony, Trial Tr. at 158:5-7, 159:12-14 (7/17/14).) After identifying the '737 Patent and the related G.mcs draft recommendation, Fujitsu's Patent Statement concludes by stating:

> Fujitsu is willing to grant license under reasonable terms and conditions for the purpose of implementation of Q.25 – Q.27 recommendations, in compliance with ITU-T TSB patent policy 2.2 to any party which will comply with TSB patent policy 2.1 or 2.2.

(Joint Ex. 2, at FJIL5653300; Fuji Testimony, Trial Tr. at 119:5-10, 123:8-14 (7/17/14).) TSB patent policy 2.2 specifically states:

> The patent holder is not prepared to waive his rights but would be willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions.

(Joint Ex. 3, at FJIL5660379.) This provision obligates Fujitsu to license its '737 Patent on RAND terms. (Joint Ex. 3, at FJIL5660379; Simcoe Testimony, Trial Tr. at 366:2-13 (7/18/14); Fuji Testimony, Trial Tr. at 155:20-156:5 (7/17/14).)

Fujitsu submitted its 1996 Patent Statement to draw the ITU's attention to the '737 Patent's technology relevant to the G.mcs draft recommendation, which later became G.692. (Fuji Testimony, Trial Tr. at 122:8-15; 158:2-7 (7/17/14).) By submitting this Patent Statement communicating its willingness to license on RAND terms, Fujitsu understood it was making a promise. (Fuji Testimony, Trial Tr. at 122:16-123:2; 124:6-12; 129:1-15 (7/17/14); Tellabs 18; Tellabs 22.) Fujitsu's promise was intended as a public statement of Fujitsu's official position regarding licensing the '737 Patent. (Fuji Testimony, Trial Tr. at 124:6-12 (7/17/14)). Fujitsu has never attempted to modify, amend, or withdraw its promise. (Fuji Testimony, Trial Tr. at 157:18-21 (7/17/14)). This public promise is visible on the ITU's website. (Tellabs Ex. 22.)

Fujitsu purposefully selected provision 2.2 of the ITU's statement on TSB patent policy, which provides that Fujitsu is willing to license its patent on RAND terms. (Joint Ex. 2, at FJIL5653300; Fuji Testimony, Trial Tr. at 154:23-155:1, 155:20-157:10 (7/17/14); Joint Ex. 3, at FJIL5660379; *see also* Tellabs Ex. 22, at TLTX26360689.) Fujitsu did not choose provision 2.3 of the ITU's patent policy, under which Fujitsu would have reserved the right <u>not</u> to license its patent. (Fuji Testimony, Trial Tr. at 155:4-19 (7/17/14); Simcoe Testimony, Trial Tr. at 366:22-367:19 (7/18/14); Joint Ex. 2, at FJIL5653300; Joint Ex. 3, at FJIL5660379.) When a party selects provision 2.3, no Recommendation can be established. (Joint Ex. 3, at FJIL5660379.) Therefore, by selecting provision 2.2 of the ITU's patent policy, Fujitsu allowed the G.692 standard to be established and obtained the valuable benefits associated with participation in a widely-adopted industry standard. (Simcoe Testimony, Trial Tr. at 357:6-24, 358:24-359:9, 366:2-21 (7/18/14).) Indeed, the G.692 standard specifically states its reliance on the agreements made by patent holders such as Fujitsu:

> The ITU draws attention to the possibility that the practice or implementation of this Recommendation may involve the use of a claimed Intellectual Property

Right…As of the date of approval of this Recommendation, the ITU had received notice of intellectual property, protected by patents, which may be required to implement this Recommendation.

(Joint Ex. 6, at ii (FJIL5445382).)

In filing its 1996 Patent Statement (Joint Ex. 2) with the ITU, Fujitsu specifically complied with numbered paragraph 3 of the ITU's statement on TSB patent policy. (Fuji Testimony, Trial Tr. at 153:22-154:16 (7/17/14).) Numbered paragraph 3 of the ITU's statement on TSB patent policy prohibits a patent holder from imposing any provisions, conditions, or exclusions beyond what is specifically provided in the selected licensing provision. (Fuji Testimony, Trial Tr. at 153:22-154:16 (7/17/14); Joint Ex. 3, at FJIL5660379.) Therefore, there are no limitations, conditions, or exclusions on Fujitsu's agreement to license the '737 Patent on RAND terms.

Accordingly, Tellabs has proven that, in Fujitsu's May 27, 1996 letter and Patent Statement (Joint Ex. 2), Fujitsu agreed it was willing to grant a license of Fujitsu's '737 Patent's technology on RAND terms in compliance with the ITU's Patent Policies. There is no legally sufficient basis for a reasonable jury to find otherwise, and Tellabs requests judgment as a matter of law on this issue.

## II.    TELLABS HAS PROVEN THAT FUJITSU'S '737 PATENT'S TECHNOLOGY WAS INCLUDED IN ONE OR MORE OF THE NECESSARY SPECIFICATIONS OF THE STANDARDIZED TECHNOLOGY RECOMMENDED BY THE ITU'S RECOMMENDATION G.692.[2]

Tellabs has proven that the '737 Patent's technology is included in, and may be required to implement, one or more of the necessary specifications of the G.692 standard. Indeed, the G.692 standard specifically refers to the incorporation of Intellectual Property Rights of patent holders, such as Fujitsu, who provided notice to the ITU prior to approval of the G.692 standard:

---

[2] Verdict Form Question 2.

> The ITU draws attention to the possibility that the practice or implementation of this Recommendation <u>may involve the use of a claimed Intellectual Property Right</u>…As of the date of approval of this Recommendation, the ITU had received notice of intellectual property, protected by patents, which <u>may be required to implement this Recommendation.</u>

(Joint Ex. 6, at ii (FJIL5445382) (emphasis added).)

In addition, the evidence presented at trial conclusively establishes that claim 11 of the '737 Patent may be required to implement the preferred 1510 nm optical supervisory channel specified in the G.692 standard. In particular, Tellabs' expert, Dr. Buckman, demonstrated that every element of claim 11 of the '737 Patent may be found in the G.692 standard in connection with the specification of an out-of-band optical supervisory channel having a wavelength of 1510 nm. (Buckman Testimony, Trial Tr. PM (7/21/2014).) At the very least, the evidence presented at trial conclusively establishes that the '737 Patent's technology is one way to implement the preferred 1510 nm optical supervisory channel specified in the G.692 standard. (Buckman Testimony, Trial Tr. PM (7/21/14).)

## A. The G.692 Standard Includes a "Method for Amplifying an Optical Signal" as Recited in Claim 11 of the '737 Patent.

The preamble of claim 11 of the '737 Patent recites "[a] method for amplifying an optical signal comprising the steps of. . ." (Joint Ex. 1, at 9:17-18.) Dr. Buckman found that the G.692 standard requires a method for amplifying an optical signal. (Buckman Testimony, Trial Tr. PM (7/21/2014).) G.692 "applies to optical interfaces for multichannel optical line systems <u>with optical amplifiers</u> . . ." (Joint Ex. 6, at 1 (FJIL5445387) (emphasis added).) G.692 also states that "[t]his Recommendation has been prepared from the experience with <u>Erbium-Doped</u>…<u>Fibre Amplifiers</u> (EDFA), operating in the 1550 nm wavelength region." (Joint Ex. 6, at 1 (FJIL5445387) (emphasis added).) G.692 further explains:

> <u>Optical line systems</u> described within this Recommendation that employ <u>line amplifiers</u> require an additional Optical Supervisory Channel (OSC). This channel

shall be capable of being accessed at each <u>amplifier</u>. For optical line amplifiers implemented using <u>Erbium-Doped Fibre Amplifier</u> (EDFA) technology, the optical supervisory channel can be located outside the usable gain bandwidth of the EDFA ("out-of-band OSC") or alternatively, within the usable gain bandwidth ("in-band OSC").

(Joint Ex. 6, at 6 (FJIL5445392) (emphasis added).) Dr. Buckman testified that an EDFA is a device for amplifying an optical signal. (Buckman Testimony, Trial Tr. PM (7/21/14).) Therefore, the G.692 standard includes a "method for amplifying an optical signal" as recited in claim 11 of the '737 Patent.

**B.      The G.692 Standard Includes the Step of "Emitting a Pumping Light Beam" as Recited in the '737 Patent.**

The first step of claim 11 of the '737 Patent recites "emitting a pumping light beam." (Joint Ex. 1, at 9:19.) Dr. Buckman found that the G.692 standard requires the emission of a pumping light beam. (Buckman Testimony, Trial Tr. PM (7/21/14).) G.692 states that "[t]his Recommendation has been prepared from the experience with <u>Erbium-Doped…Fibre Amplifiers</u> (EDFA), operating in the 1550 nm wavelength region." (Joint Ex. 6, at 1 (FJIL5445387) (emphasis added).) It further states:

> For optical line amplifiers implemented using <u>Erbium-Doped Fibre Amplifier</u> (EDFA) technology, the optical supervisory channel can be located outside the usable gain bandwidth of the EDFA ("out-of-band OSC") or alternatively, within the usable gain bandwidth ("in-band OSC").

(Joint Ex. 6, at 6 (FJIL5445392) (emphasis added).) Dr. Buckman explained that an EDFA requires the emission of a pumping light beam in order to amplify (i.e., provide gain to) optical signals because the pumping light beam provides the energy that the EDFA uses to amplify optical signals. (Buckman Testimony, Trial Tr. PM (7/21/14).) Therefore, the G.692 standard includes the step of "emitting a pumping light beam" as recited in claim 11 of the '737 Patent.

**C.      The G.692 Standard Includes the Step of "Receiving A First Optical Signal Of A First Wavelength And A Second Optical Signal Of A Second Wavelength" as Recited in the '737 Patent.**

The second step of claim 11 of the '737 Patent recites "receiving a first optical signal of a first wavelength and a second optical signal of a second wavelength." (Joint Ex. 1, at 9:20-21.) Dr. Buckman found that this step is required by the G.692 standard. (Buckman Testimony, Trial Tr. PM (7/21/14).)

In the context of the G.692 standard, the "first optical signal" is the signal to be amplified, i.e., a subscriber signal. (Buckman Testimony, Trial Tr. PM (7/21/14).) G.692 "applies to optical interfaces for multichannel optical line systems with optical amplifiers . . ." (Joint Ex. 6, at 1 (FJIL5445387) (emphasis added).) It also states that "[t]his Recommendation has been prepared from the experience with Erbium-Doped…Fibre Amplifiers (EDFA), operating in the 1550 nm wavelength region." (Joint Ex. 6, at 1 (FJIL5445387) (emphasis added).) G.692 further refers to "the usable gain bandwidth" of an EDFA. (Joint Ex. 6, at 6 (FJIL5445392). Dr. Buckman explained that the "first optical signal" recited in claim 11 corresponds to a subscriber signal, which lies within the usable gain bandwidth of an EDFA. (Buckman Testimony, Trial Tr. PM (7/21/14).)

In the context of the G.692 standard, the "second optical signal" is the specified optical supervisory channel. G.692 states that "[o]ptical line systems described within this Recommendation that employ line amplifiers require an additional Optical Supervisory Channel (OSC)." (Joint Ex. 6, at 6 (FJIL5445392) (emphasis added). Dr. Buckman explained that this additional OSC signal corresponds to the second optical signal recited in claim 11. (Buckman Testimony, Trial Tr. PM (7/21/14).)

As explained by Dr. Buckman, the first optical signal and the second optical signal—i.e., the subscriber signal and the optical supervisory channel—have different wavelengths. (Buckman Testimony, Trial Tr. PM (7/21/14).) G.692 states that "[t]his Recommendation has

been prepared from the experience with Erbium-Doped…Fibre Amplifiers (EDFA), operating in the 1550 nm wavelength region. (Joint Ex. 6, at 1 (FJIL5445387) (emphasis added).) Under the heading "Optical supervisory channel wavelength," G.692 further states:

> The optical supervisory channel wavelength is the wavelength on which the optical supervisory channel is transmitted. It is nominally 1510 ± 10 nm…

(Joint Ex. 6, at 12 (FJIL5445398) (emphasis added).)

Accordingly, G.692 includes the step of "receiving a first optical signal of a first wavelength and a second optical signal of a second wavelength" as recited in claim 11 of the '737 Patent.

**D.**     **The G.692 Standard Includes the Step of "Branching The Second Optical Signal From The First Optical Signal For Receipt By A Receiver" as Recited in Claim 11 of the '737 Patent.**

The third step of claim 11 of the '737 Patent recites "branching the second optical signal from the first optical signal for receipt by a receiver." (Joint Ex. 1, at 10:1-2.) Dr. Buckman found that this step is required by the G.692 standard. (Buckman Testimony, Trial Tr. PM (7/21/14).)

G.692 defines the optical supervisory channel as "[a] channel that is accessed at each optical line amplifier site that is used for maintenance purposes including (but not limited to) remote site alarm reporting, communication necessary for fault location, and orderwire." (Joint Ex. 6, at 2 (FJIL5445388) (emphasis added).) G.692 further states that the additional optical supervisory channel "shall be capable of being accessed at each amplifier." (Joint Ex. 6, at 6 (FJIL5445392) (emphasis added).) Dr. Buckman explained that branching is required in order to access the optical supervisory channel, and receipt by a receiver is required in order to receive

and use the information carried by the optical supervisory channel. (Buckman Testimony, Trial Tr. PM (7/21/14).)

Importantly, Dr. Buckman explained exactly why branching is necessary when implementing an optical supervisory channel at 1510 nm. In particular, Dr. Buckman stated that an optical supervisory channel at 1510 nm must be branched from the subscriber signal before it reaches an erbium-doped fiber. (Buckman Testimony, Trial Tr. PM (7/21/14).) As Dr. Buckman explained, if the OSC is not branched prior to reaching an erbium-doped fiber, the OSC will be absorbed when it passes through the erbium-doped fiber to the point that it might no longer be accessible. (Buckman Testimony, Trial Tr. PM (7/21/14).) Figure 6 of the '737 Patent illustrates an apparatus and process for branching an optical signal prior to entering an erbium-doped fiber. (Joint Ex. 1, Fig. 6; *see also* Joint Ex. 1, at 5:30-35 (describing the splitting of first and second optical signals prior to inputting the signal light beam into a rare-earth-doped fiber).)

The need to branch an optical supervisory channel at 1510 nm is highly relevant because in specifying the wavelength of the optical supervisory channel, the G.692 standard expresses a preference for 1510 nm over all other alternative implementations. (Buckman Testimony, Trial Tr. PM (7/21/14).) In particular, G.692 specifies that the optical supervisory channel "is nominally 1510 $\pm$ 10 nm." (Joint Ex. 6, at 12 (FJIL5445398).) Although other wavelengths are permitted, this is the only wavelength specifically called out in the section titled "Optical supervisory channel parameters" under the subheading "Optical supervisory channel wavelength." (Joint Ex. 6, at 12 (FJIL5445398).) Identification of the 1510 nm wavelength in particular indicates a preference for this wavelength. (*See* Buckman Testimony, Trial Tr. PM (7/21/14).) In fact, even when G.692 first discusses the available options for implementing an optical supervisory channel, it refers to the wavelength of 1510 nm as "[t]he nominal <u>preferred</u>

wavelength for the out-of-band Optical Supervisory Channel (OSC)." (Joint Ex. 6, at 6 (FJIL5445392) (emphasis added).) Therefore, the "branching" step of claim 11 of the '737 Patent may be required to implement the preferred 1510 nm optical supervisory channel specified in the G.692 standard.

Accordingly, the G.692 standard includes the step of "branching the second optical signal from the first optical signal for receipt by a receiver" as recited in claim 11 of the '737 Patent.

        E.       **The G.692 Standard Includes the Step of "Inputting The Pumping Light Beam And The First Optical Signal To A Rare Earth Element Doped Optical Fiber" as Recited in Claim 11 of the '737 Patent.**

The last step of claim 11 recites "inputting the pumping light beam and the first optical signal to a rare earth element doped optical fiber." (Joint Ex. 1, at 10:3-4.) Dr. Buckman found that this step is required by the G.692 standard. In particular, G.692 states that "[t]his Recommendation has been prepared from the experience with <u>Erbium-Doped…Fibre Amplifiers</u> (EDFA), operating in the 1550 nm wavelength region." (Joint Ex. 6, at 1 (FJIL5445387) (emphasis added).) It further states:

> For optical line amplifiers implemented using <u>Erbium-Doped Fibre Amplifier</u> (EDFA) technology, the optical supervisory channel can be located outside the usable gain bandwidth of the EDFA ("out-of-band OSC") or alternatively, within the usable gain bandwidth ("in-band OSC").

(Joint Ex. 6, at 6 (FJIL5445392) (emphasis added).) Dr. Buckman stated that erbium is a rare earth element. (Buckman Testimony, Trial Tr. PM (7/21/14).) Dr. Buckman also explained that EDFAs operate to amplify an optical signal only when both the pumping light beam and the signal to be amplified are input to the erbium-doped fiber. (Buckman Testimony, Trial Tr. PM (7/21/14).) Dr. Buckman further explained that the "first optical signal" recited in claim 11 corresponds to a subscriber signal, which lies within the usable gain bandwidth of an EDFA, i.e., the signal to be amplified. (Buckman Testimony, Trial Tr. PM (7/21/14).) Therefore, the G.692

standard includes the step of "inputting the pumping light beam and the first optical signal to a rare earth element doped optical fiber" as recited in claim 11 of the '737 Patent.

## F.    The 737 Patent's Technology Was Included In The G.692 Standard, And Fujitsu' Arguments Are Irrelevant To This Verdict Form And Contrary To The Law

In sum, the evidence conclusively proves that at least claim 11 of the '737 Patent may be required for implementation of an optical supervisory channel at 1510 nm in an EDFA as specified in the G.692 standard. The evidence in this regard is uncontroverted.

Fujitsu presents only a single rebuttal on this element of Tellabs' defense, specifically, that the G.692 standard discloses possible alternative wavelengths for the optical supervisory channel. Fujitsu's rebuttal is legally insufficient to support a finding in Fujitsu's favor because alternative embodiments are irrelevant to whether the '737 Patent may be required for implementation of an optical supervisory channel at 1510 nm. The existence of alternative embodiments does not contradict, or in any way tend to disprove, the fact that the '737 Patent may be required to implement the preferred out-of-band optical supervisory channel specified at 1510 nm in G.692. Accordingly, no reasonable jury could find in favor of Fujitsu on this issue.

Furthermore, Fujitsu's own documents show that the 737 Patents' technology is related to G.692, and Fujitsu and the ITU have both related the '737 Patent to the G.692 standard. For example, Fujitsu's own internal database states that the '737 Patent is "[r]elated to [the] Optical Service Channel described in ITU-T…G.692." (Tellabs Ex. 18, at 1; Fuji Testimony, Trial Tr. at 185:21-186:9, 187:8-14, 188:5-15; 189:13-17 (7/17/14).) Similarly, Fujitsu's 1996 Patent Statement contains markings made by staff at the ITU specifically associating G.692 with the '737 Patent. (Joint Ex. 2, FJIL5653300; Fuji Testimony, Trial Tr. at 157:22-158:24, 159:8-160:11 (7/17/14).) Finally, the ITU's publicly available internet database explicitly relates the

'737 Patent to G.692. (Tellabs Ex. 22, at TLTX26360689; Fuji Testimony, Trial Tr. at 156:6-157:10 (7/17/14).)

Finally, Fujitsu's own allegations of infringement in this lawsuit prove that the '737 Patent may be required for implementation of the G.692 standard. Fujitsu has sued Tellabs for infringement of the '737 Patent based on the use and branching of a 1510 nm optical supervisory channel in Tellabs' optical amplifiers. (*See*, *e.g.*, Fujitsu Limited's Mot. for Summ. J. of Infringement of Claims 4 and 5 of U.S. Patent No. 5,521,737, Case 1:09-cv-4530, Dkt. 601, at 11-12 (referring to the "OSC add/drop feature" of Tellabs LIAM-E and LRAM-E amplifiers) and 17 (stating that the OSC coupler "branches the second optical signal from the first") (May 4, 2012).) As the evidence shows, Tellabs' optical amplifiers implement the preferred 1510 nm optical supervisory channel specified in G.692. (Tellabs Ex. 107A, at TLTX26151284-89; Tellabs Ex. 109A, at TLTX0487011-15; Tellabs Ex. 110A, at TLTX0899302, TLTX0899304; Tellabs Ex. 111A, at TLTX4403523-27; Tellabs Ex. 137A, at TLIL0197596-97; *see also* Craft Testimony, Trial Tr. at 85:11-86:12, 87:5-17, 88:24-89:7, 89:12-25, 90:21-92:4 (7/17/14).) Thus, Fujitsu's infringement allegations, standing alone, prove that the '737 Patent may be required to implement one of the necessary specifications of the G.692 standard; otherwise, Fujitsu would not have filed this lawsuit.

Accordingly, the evidence is conclusive. Indeed, Fujitsu's own counsel concedes that "of course" someone can practice the G.692 standard using the '737 Patent's technology. (Van Dyke Response to Court's Question, Trial Tr. at 172:19-22 (7/17/14).) Accordingly, Tellabs has proven that the '737 Patent's technology may be required to implement one of the necessary specifications of G.692, and no reasonable jury could find in favor of Fujitsu on this issue.

**III.    FUJITSU BREACHED ITS AGREEMENT THAT IT WAS WILLING TO GRANT A LICENSE TO THE '737 PATENT ON RAND TERMS.[3]**

**A.    Fujitsu Breached its RAND Agreement by Not Offering to Grant Tellabs a License on RAND Terms for Fujitsu's '737 Patent's Technology.**

Fujitsu's 1996 ITU Patent Statement requires it to be willing to grant license to its '737 Patent to anyone on RAND terms—thus, it requires Fujitsu to offer RAND licenses to any implementers of the G.692 standard whom Fujitsu believes are using the '737 Patent. (Simcoe Testimony, Trial Tr. at 361:17-362:4, 366:2-13, 374:22-377:14 (7/18/14); Joint Ex. 2, at FJIL5653300; Joint Ex. 3, at FJIL5660379; *see also* Fuji Testimony, Trial Tr. at 122:16-123:2; 123:8-14; 124:6-12; 129:1-15 (7/17/14); Tellabs Ex. 18, at 1; Tellabs Ex. 22, at TLTX26360689.) But Fujitsu has never offered Tellabs a license on RAND terms. Indeed, it is undisputed that Fujitsu never offered Tellabs any royalty terms whatsoever, RAND or otherwise. (Fuji Testimony, Trial Tr. at 221:4-222:10 (7/17/14)). In fact, Fujitsu did not even consider offering Tellabs a RAND license, despite Fujitsu's agreed willingness to do so. (Fuji Testimony, Trial Tr. at 222:25-223:3 (7/17/14)). Fujitsu had ample opportunity to make such an offer (Fuji Testimony, Trial Tr. at 221:15-222:10 (7/17/14)) but chose not to (Fuji Testimony, Trial Tr. at 221:4-221:8, 221:15-22 (7/17/14)). Because it is undisputed that Fujitsu never offered a RAND license, there is no legally sufficient basis for a reasonable jury to conclude in favor of Fujitsu on the issue of whether Fujitsu breached its RAND agreement.

**B.    Fujitsu Breached its RAND Agreement by an Seeking Injunction.**

"Injunctive relief is not granting a license, which is fundamentally inconsistent with a promise to grant a license to anyone who wishes to use the standard." (Simcoe Testimony, Trial Tr. at 384:6-10 (7/18/14).) Fujitsu made a commitment to license implementers of the G.692 standard on RAND terms. (Simcoe Testimony, Trial Tr. at 361:17-362:4, 366:2-13, 374:22-377:14 (7/18/14); Joint Ex. 2, at FJIL5653300; Joint Ex. 3, at FJIL5660379; Fuji Testimony, Trial Tr. at 122:16-123:2, 123:8-14, 124:6-12, 129:1-15, 153:5-21, 154:23-155:1, 155:20-156:5

---

[3] Verdict Form Question 3.

(7/17/14); Tellabs Ex. 18, at 1; Tellabs Ex. 22, at TLTX26360689.) At the very least, Fujitsu's RAND commitment must mean that it will not pursue injunctions against implementers without first offering a RAND license. *See Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998, 1008 (N.D. Cal. 2013) (concluding seeking an injunction before offering a license constitutes breach of a RAND commitment); *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 913-14 (N.D. Ill. 2012), *aff'd in part, rev'd in part and remanded on other grounds*, 2012-1548, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014) ("I don't see how, given FRAND, I would be justified in enjoining Apple from infringing the '898 unless Apple refuses to pay a royalty that meets the FRAND requirement).

In order to gain a foothold in the standard and not have its patented technology excluded, Fujitsu made a RAND commitment and, thereby, *surrendered* some of its statutorily-granted property rights. (Simcoe Testimony, Trial Tr. at 361:17-362:4, 366:2-13, 374:22-377:14 (7/18/14); Joint Ex. 2, at FJIL5653300; Joint Ex. 3, at FJIL5660379; Fuji Testimony, Trial Tr. at 122:16-123:2, 123:8-14, 124:6-12, 129:1-15, 153:5-21, 154:23-155:1, 155:20-156:5 (7/17/14).) Had it not made the RAND licensing commitment—for example, by selecting provision 2.3 of the ITU's patent policy (Joint Ex. 3, at FJIL5660379)—Fujitsu could have attempted to exclude every party that allegedly used its patented OSC technology. Instead, Fujitsu committed to license its '737 Patent on RAND terms and, thereby, allowed the G.692 standard to include the '737 Patent's technology for branching optical supervisory channels. (Joint Ex. 2, at FJIL5653300 (stating that the '737 Patent, numbered (4), "claims the optical branching of WDM signals before optical amplification).) In doing so, Fujitsu committed to *exclude no one*, and to make licenses available to *"any party."* (Fuji Testimony, Trial Tr. at 123:8-15; 154:23-155:1 (7/17/14); Joint Ex. 2, at FJIL5653300.) If Fujitsu had not made this commitment, the ITU would have excluded the '737 Patent's technology from the G.692 standard. (Fuji Testimony, Trial Tr.

at 155:11-17 (7/17/14); Simcoe Testimony, Trial Tr. at 366:22-367:19 (7/18/14); Joint Ex. 3, at FJIL5660379 ("in such case, no recommendation can be established.").)

While a patent grant[4] gives a patent holder "the right to exclude others from making, using, . . . or selling the invention," 35 U.S.C. § 154, the right to exclude can be waived by contract. *See Mallinckrodt, Inc. v. Medipart, Inc*., 976 F.2d 700, 703 (Fed. Cir. 1992) ("This right to exclude may be waived in whole or in part. The conditions of such waiver are subject to patent, contract, antitrust, and any other applicable law, as well as equitable considerations such as are reflected in the law of patent misuse."); s*ee also Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1342 (Fed. Cir. 2007) ("[I]mplicit in the right to exclude is the right to waive that right."). A patent license is one example of such a waiver. *Morrow*, 499 F.3d at 1342. A RAND licensing commitment is another example. It is hard to imagine a clearer waiver of the right to exclude than a contractual promise to grant licenses (*i.e.*, forego exclusion) on reasonable and non-discriminatory terms to anyone who wants to make use of a standardized technology.

For these reasons, there is no legally sufficient basis for a reasonable jury to find for Fujitsu.

## C. Fujitsu Breached its RAND Agreement by Seeking a Non-RAND Royalty Rate.

Tellabs has proven that Fujitsu breached its RAND commitment by seeking a non-RAND royalty rate because there is no legally sufficient basis for a jury to find otherwise. Fujitsu made a RAND commitment. (Simcoe Testimony, Trial Tr. at 361:17-362:4, 366:2-13, 374:22-377:14 (7/18/14); Joint Ex. 2, at FJIL5653300; Joint Ex. 3, at FJIL5660379; Fuji Testimony, Trial Tr. at 122:16-123:2, 123:8-14, 124:6-12, 129:1-15, 153:5-21, 154:23-155:1, 155:20-156:5 (7/17/14).)

---

[4] A patent "contain[s] a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States." 35 U.S.C. § 154(a)(1). Patents are a "in effect, a bundle of rights which may be divided and assigned, or retained in whole or part." *Alfred E. Mann Foundation For Scientific Research v. Cochlear Corp*., 604 F.3d 1354, 1360 (Fed. Cir. 2010) (citing *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870 (Fed. Cir. 1991)).

Therefore, it gave up its right and ability to seek non-RAND royalty rates. Indeed, the premise of RAND is to license, not litigate. Prior to filing this lawsuit, however, Fujitsu never offered any license terms to Tellabs. (Fuji Testimony, Trial Tr. at 221:4-14 (7/17/14); (Rudofski Testimony, Trial Tr. AM (7/21/14); Joint Ex. 5, at 1 (Fujitsu's demand letter making no license offer to Tellabs).) In fact, Fujitsu never even considered licensing the '737 Patent to Tellabs on RAND terms. (Fuji Testimony, Trial Tr. at 222:25-223:3 (7/17/14).)

Fujitsu stipulated to breaching its RAND Agreement by Seeking a Non-RAND Royalty Rate.

### D.  Fujitsu Breached its RAND Agreement by Seeking Lost Profits.

It is uncontroverted that Fujitsu sought lost profits in violation of its agreement to license the '737 Patent's technology on RAND terms. (Craft Testimony, Trial Tr. at 101:17-20 (7/17/14); Fuji Testimony, Trial Tr. at 242:11-14 (7/18/14); Tellabs Ex. 8, at 4-5, 8.)

The ITU requires RAND commitments to prevent such abuse and hold-up: "It follows therefore that a commercial (monopolistic) abuse by a holder of a patent embodied fully or partly in a Recommendation must be excluded." (Joint Ex. 3, at FJIL5660379.) "Lost profits are inconsistent fundamentally with RAND for the same reason as an injunction. Lost profits are the profits that you would be able to realize if you could deny the license." (Simcoe Testimony, Trial Tr. at 384:21-24 (7/18/14) (emphasis added).) By making its RAND commitment, Fujitsu "implicitly acknowledged that a royalty is adequate compensation for a license to use that patent." *Apple*, 869 F. Supp. 2d at 914. Thus, Fujitsu breached its RAND agreement when it sought damages from Tellabs in the amount of Fujitsu's lost profits.

Because it is undisputed that Fujitsu sought lost profits, there is no evidentiary basis from which a reasonable jury could conclude that Fujitsu did not beach its agreement that it was

willing to grant a license of Fujitsu's '737 Patent's technology on RAND terms by filing a lawsuit against Tellabs and seeking damages in the form of lost profits.

### E. Fujitsu Breached its RAND Agreement by Filing a Lawsuit Alleging Infringement of the '737 Patent that Damaged Tellabs' Business.

There is no legally sufficient basis for a reasonable jury to find for Fujitsu on the question of whether Fujitsu breached its agreement that it was willing to grant a license of Fujitsu's '737 Patent's technology on RAND terms by filing a lawsuit against Tellabs alleging infringement of the '737 Patent that damaged Tellabs' business. Prior to filing this lawsuit, Fujitsu never offered any license terms to Tellabs. (Fuji Testimony, Trial Tr. at 221:4-14 (7/17/14); (Rudofski Testimony, Trial Tr. AM (7/21/14); Joint Ex. 5, at 1 (Fujitsu's demand letter making no license offer to Tellabs).) In fact, Fujitsu never even considered licensing the '737 Patent to Tellabs on RAND terms. (Fuji Testimony, Trial Tr. at 222:25-223:3 (7/17/14).) Instead, Fujitsu filed this lawsuit in order to "impart damage" on Tellabs' business and succeeded in this goal. (Tellabs Ex. 6, at FJ2946344; Fuji Testimony, Trial Tr. at 336:15-337:7 (7/18/14).) For example, during the course of this litigation, Tellabs' market share at Verizon has decreased from 100% to between 50% and 60%. (Craft Testimony, Trial Tr. at 97:15-98:4 (7/17/14).) This litigation has also negatively affected Tellabs' relationships with customers, such as FiberNet, by causing those customers to require Tellabs to accept additional business risk and liability through increased indemnity or limits of liability provisions. (Craft Testimony, Trial Tr. at 104:7-15, 104:22-105:15, 114:14-24 (7/17/14).)

This evidence is uncontroverted. In defense of this issue, Fujitsu asserts only that Tellabs cut off patent discussions with Fujitsu before Fujitsu could offer a license. However, Mr. Fuji readily admitted that Tellabs was not capable of stopping Fujitsu from offering a license if that is what Fujitsu had intended to do. (Fuji Testimony, Trial Tr. at 221:15-222:10 (7/17/14).)

Moreover, Mr. Fuji admitted that it would be speculative to discuss whether Fujitsu would have offered RAND terms to Tellabs because Fujitsu never considered the possibility. (Fuji Testimony, Trial Tr. at 222:25-223:13 (7/17/14).) Accordingly, no reasonable jury could find for Fujitsu on this issue.

### F. Fujitsu Breached its RAND Agreement by Filing a Lawsuit Alleging Infringement of the '737 Patent that Required Tellabs to Divert Employees' Attention and Time, as Well as Other Resources, to Defending the Lawsuit.

There is no legally sufficient basis for a reasonable jury to find for Fujitsu on the question of whether Fujitsu breached its agreement that it was willing to grant a license of Fujitsu's '737 Patent's technology on RAND terms by filing a lawsuit against Tellabs alleging infringement of the '737 Patent that required Tellabs to devote management attention and time, as well as other resources to defending the lawsuit, such as attorney's fees, expert fees, and related costs. Prior to filing this lawsuit, Fujitsu never offered any license terms to Tellabs—RAND or otherwise. (Fuji Testimony, Trial Tr. at 221:4-14 (7/17/14); Rudofski Testimony, Trial Tr. AM (7/21/14); Joint Ex. 5, at 1 (Fujitsu's demand letter making no license offer to Tellabs).) In fact, Fujitsu never even considered licensing the '737 Patent to Tellabs on RAND terms. (Fuji Testimony, Trial Tr. at 222:25-223:3 (7/17/14).) Instead, Fujitsu filed this lawsuit, the costs and administration of which has injured Tellabs. For example, this lawsuit has significantly disrupted Tellabs' business by (a) diverting the attention of Tellabs' engineers and financial employees who are tasked with producing documents and reviewing claims and designs, and by diverting the attention of Tellabs' executives for six and a half years. (Craft Testimony, Trial Tr. at 103:22-104:6 (7/17/14).) In addition, Tellabs has spent money on attorney fees defending against Fujitsu's claims of infringement in this lawsuit.

Fujitsu asserts two defenses on this issue. First, Fujitsu asserts that the management time and attorney fees that Tellabs devoted to this lawsuit have been split among the various patents

Fujitsu asserted. However, the '737 Patent has been involved in this litigation without any resolution for over six and a half years, and the evidence is uncontroverted that at least some portion of Tellabs injury is attributable to the '737 Patent. Fujitsu also asserts that Tellabs cut off patent discussions with Fujitsu before Fujitsu could offer a license. However, Mr. Fuji readily admitted that Tellabs was not capable of stopping Fujitsu from offering a license if that is what Fujitsu had intended to do. (Fuji Testimony, Trial Tr. at 221:15-222:10 (7/17/14).) Moreover, Mr. Fuji admitted that it would be speculative to discuss whether Fujitsu would have offered RAND terms to Tellabs because Fujitsu never considered the possibility. (Fuji Testimony, Trial Tr. at 222:25-223:13 (7/17/14).) Accordingly, no reasonable jury could find for Fujitsu on this issue.

## IV. TELLABS WOULD HAVE BEEN WILLING TO NEGOTIATE A LICENSE OF FUJITSU'S '737 PATENT'S TECHNOLOGY FROM FUJITSU ON RAND.[5]

As it does with other competitors, Tellabs would have entertained a license that was fair and reasonable. (Craft Testimony, Trial Tr. at 105:17-106:4 (7/17/14).) If Fujitsu had offered Tellabs a license to the '737 Patent, Tellabs would have considered it, and Tellabs would have been willing to negotiate a license on RAND terms. (Rudofski Testimony, Trial Tr. AM (7/21/14).) Fujitsu, however, never even considered offering Tellabs a RAND license and never discussed RAND terms with Tellabs. (Fuji Testimony, Trial Tr. at 222:25-223:3; 221:4-221:14 (7/17/14).)

Indeed, at the very first meeting with Tellabs in May 2007, Fujitsu indicated that it was unwilling to offer Tellabs a license to the '737 Patent. At that meeting, Fujitsu made three presentations detailing Fujitsu's infringement allegations. (Rudofski Testimony, Trial Tr. AM (7/21/14).) One presentation addressed patents that Fujitsu alleged were related to

---

[5] Verdict Form Question 4

telecommunication standards. (Rudofski Testimony, Trial Tr. AM (7/21/14).) The '737 Patent was addressed in a separate presentation. (Rudofski Testimony, Trial Tr. AM (7/21/14).) During the meeting, Fujitsu stated that it was willing to grant a license to the telecommunication standards-related patents, but had not decided what to do about the other patents—including the '737 Patent. (Rudofski Testimony, Trial Tr. AM (7/21/14).) Mr. Rudofski found this statement to be so odd that he was immediately concerned that Fujitsu might file a lawsuit and seek an injunction. (Rudofski Testimony, Trial Tr. AM (7/21/14).)

As Mr. Rudofski testified, he expected Fujitsu, as the patent holder asserting infringement, to make the first move in offering a license to Tellabs. (Rudofski Testimony, Trial Tr. AM (7/21/14).) If Fujitsu had wanted to make an offer on RAND terms to Tellabs, Tellabs could not have stopped them. (Fuji Testimony, Trial Tr. at 221:15-22 (7/17/14).) Fujitsu simply chose not to. (Fuji Testimony, Trial Tr. at 221:4-14, 222:4-10 (7/17/14).) Indeed, Fujitsu never even considered offering a RAND license to Tellabs. (Fuji Testimony, Trial Tr. at 222:25-223:3, 221:4-221:14 (7/17/14).)

Since Fujitsu never even considered offering a RAND license to Tellabs, a reasonable jury can draw no inferences from Mr. Fuji's testimony about Tellabs' willingness to negotiate a license on RAND terms. Even if the jury accepts Fujitsu's argument that, at the end of its November 30, 2007 teleconference with Tellabs, Fujitsu offered to discuss business terms for resolving the patent discussions and Tellabs refused, the uncontroverted fact remains that Fujitsu had no intention of offering a RAND license to Tellabs. (*See* Fuji Testimony, Trial Tr. at 222:17-223:3 (7/17/14).) Indeed, Fujitsu absolutely denies that it was ever obligated to offer a RAND license to Tellabs. (Fuji Testimony, Trial Tr. at 222:13-223:3 (7/17/14).) Fujitsu's offer to discuss business terms was, in fact, nothing but a ruse designed to position Fujitsu for litigation:

Note that Bingham McCutchen LLP has advised that there is a possibility of Tellabs filing suit to seek declaratory judgment of invalidity of our patents and/or non-infringement that, <u>to have the litigation in FNC's home court, we should negotiate in a way that we can be the one to initiate</u>.

(Tellabs Ex. 6, at FJ2946345 (emphasis added).)

Fujitsu's admitted unwillingness to offer RAND terms, its denial of an obligation to do so, and its strategy for negotiating so that it can be the party to initiate litigation are all perfectly consistent with Mr. Rudofski's testimony that Fujitsu never expressed willingness to offer a license to the '737 Patent on RAND terms to Tellabs. Therefore, if Tellabs refused anything, it only refused to discuss business terms that, by Fujitsu's own admission, would not have included RAND terms for the '737 Patent. This is simply not evidence of Tellabs' unwillingness to discuss RAND terms. The <u>only evidence</u> regarding Tellabs' willingness to negotiate a license on RAND terms comes from the testimony of Mr. Craft and Mr. Rudofski. (Craft Testimony, Trial Tr. at 105:17-106:4 (7/17/14); Rudofski Testimony, Trial Tr. AM (7/21/14).) Their testimony is uncontroverted that Tellabs would have considered, and would have been willing to negotiate, a license on RAND terms had such an offer been made by Fujitsu. (Craft Testimony, Trial Tr. at 105:17-106:4 (7/17/14); Rudofski Testimony, Trial Tr. AM (7/21/14).) After all, companies are generally willing to license a patent to forego litigation if the cost of the license is less than the cost of litigation. (Simcoe Testimony, Trial Tr. at 401:6-14 (7/18/14).)

Accordingly, Tellabs has proven that it was willing to negotiate a license to the '737 Patent on RAND terms because there is no legally sufficient basis for a reasonable jury to find otherwise.

## V.    FUJITSU WILLFULLY BREACHED ITS RAND OBLIGATIONS UNDER BOTH CLEAR AND CONVINCING AND PREPONDERANCE STANDARDS.[6]

[6] Verdict Form Questions 5 and 6.

Tellabs has proven by a preponderance of the evidence that Fujitsu was willful in Fujitsu's breach of its agreement that it was willing to grant a license to the '737 Patent on RAND terms, in that Fujitsu's breach was intentions, knowing, and with conscious disregard for Tellabs' rights, or alternatively, was done with reckless disregard for Tellabs' obvious or known rights. Tellabs has also proven this element by clear and convincing evidence.

### A.    Fujitsu was Motivated to Damage Tellabs Because it was Losing Business to Tellabs.

In 2005, Tellabs competed against Fujitsu to win a deal with Verizon for the sale of over a billion dollars of optical amplifier technology. (Craft Testimony, Trial Tr. at 92:13-24, 94:6-23; Fuji Testimony, Trial Tr. at 195:19-196:14, 198:5-17 (7/17/14).) Verizon was an important customer for Fujitsu. (Fuji Testimony, Trial Tr. at 195:19-21 (7/18/14).) Indeed, it was the largest customer of Fujitsu's US subsidiary FNC (Tellabs Ex. 44, at FJIL5565373), and after losing this billion-dollar deal with Verizon, Fujitsu looked into suing Tellabs for patent infringement (Tellabs Ex. 44, at FJIL5565372). Fujitsu, however, made its decision to sue Tellabs even though it had *no* evidence suggesting that Tellabs infringed its patents. (Tellabs Ex. 44, at FJIL5565372-73 ("we plan to enforce Fujitsu US Patents . . . we have not successful locate such evidence").) Indeed, Fujitsu's real motivation for the suit was to impart damage on Tellabs in order to recover lost market share:

> Meanwhile, the competition between Tellabs 7100, against which we are asserting patent infringement, and our product[s] is very fierce; the Business Div. has a strong intention to want to impart damage on Tellabs' 7100 business and to halt the decrease in our products' market share.

(Tellabs Ex. 6, at FJ2946344; Fuji Testimony, Trial Tr. at 204:11-17; 205:6-21; 209:9-13 (7/17/14); Fuji Testimony, Trial Tr. at 336:15-337:7 (7/18/14); *see also* Craft Testimony, Trial Tr. at 97:15-98:4 (7/17/14) (describing loss of market share by Tellabs, and corresponding capture of market share by Fujitsu, during pendency of this lawsuit).)

**B. Fujitsu Knew of its RAND Obligations Before it Sued Tellabs and Continued to Believe in those Obligations During the Pendency of this Lawsuit.**

Dating back to 1996, Mr. Fuji was intricately involved in the disclosure of Fujitsu's '737 Patent to the ITU, personally reviewing the statement. (Fuji Testimony, Trial Tr. at 123:19-124:1 (7/17/14).) Mr. Fuji later personally observed that ITU's publicly accessible internet database showed the '737 Patent was subject to a RAND obligation under the TSB patent policy 2.2. (Fuji Testimony, Trial Tr. at 129:1-15; 157:11-21 (7/17/14).) The Patent Statement remains publically available on the ITU website and has never been modified, amended, or withdrawn. (Fuji Testimony, Trial Tr. at 122:16-123:2; 124:6-12; 129:1-15;157:18-21 (7/17/14).) Fujitsu's own internal database even states that the '737 Patent is "[r]elated to [the] Optical Service Channel described in ITU-T…G.692." (Tellabs Ex. 18, at 1; Fuji Testimony, Trial Tr. at 185:21-186:9, 187:8-14, 188:5-15; 189:13-17 (7/17/14).)

Fujitsu never forgot that the '737 Patent's technology was included in G.692. Indeed, in licensing negotiations with Ericsson, Fujitsu alleged infringement of the '737 Patent based on Ericsson's implementation of the G.692 standard. (Fuji Testimony, Trial Tr. at 161:13-162:11 (7/17/14).) In these negotiations, Fujitsu mapped every step of claim 11 of the '737 Patent onto the G.692 standard. (Tellabs Ex. 17A, at FJIL5576759, FJIL5576761-62; Tellabs Ex. 10A, at FJIL5569233.) Fujitsu even argued that Ericsson needed to take a RAND license to Fujitsu's "Statement Patents," including the '737 Patent. (Tellabs Ex. 11A, at FJIL5600682 (defining "Statement Patents") and FJIL5600685 (offering RAND terms for license to Statement Patents).)

In the very same month that Fujitsu made its presentation to Ericsson mapping claim 11 of the '737 Patent onto the G.692 standard, it had discussions with Tellabs based on prior presentations in which it had concealed the '737 Patent's relationship to the G.692 standard. (Tellabs Ex. 17A, at FJIL5576759, FJIL5576761-62 (dated November 2, 2007, and mapping

claim 11 of the '737 Patent onto the G.692 standard); Tellabs Ex. 6, at FJ2946344 (showing discussions with Tellabs on Sept. 27, Oct. 25, Nov. 15, and Nov. 30, 2007); Fuji Testimony, Trial Tr. at 216:1-24 (7/17/14) (discussing dates of teleconferences with Tellabs); Rudofski Testimony, Trial Tr. AM (7/21/14) (discussing Fujitsu's inclusion of the '737 Patent in a different presentation than the telecommunication standard-related patents during discussions with Tellabs).) Fujitsu cannot claim Mr. Fuji was unaware of the differences in how Fujitsu treated Ericsson and Tellabs because Mr. Fuji was personally involved in both negotiations. (Fuji Testimony, Trial Tr. at 161:13-18, 216:1-24 (7/17/14); Rudofski Testimony, Trial Tr. AM (7/21/14).)

Even after Fujitsu had filed suit against Tellabs seeking lost profits, treble damages, and an injunction, Fujitsu continued to assert in presentations to Ericsson that it had mapped all of the asserted claim elements of the '737 Patent onto the G.692 standard. (Fuji Testimony, Trial Tr. at 178:2-8 (7/17/14); Tellabs Ex. 10A, at FJIL5569187 (dated October 16-17, 2008); Tellabs Ex. 8, at 4-5, 8 (dated January 29, 2008).) Fujitsu even offered Ericsson a RAND license to Fujitsu's "Statement Patents," which included the '737 Patent. (Tellabs Ex. 11A, at FJIL5600682 (defining "Statement Patents") and FJIL5600685 (offering RAND terms for license to Statement Patents).)

As Mr. Fuji testified, Fujitsu believed the presentations it made to Ericsson during licensing negotiations to be truthful. (Fuji Testimony, Trial Tr. at 177:5-15, 178:18-22 (7/17/14).) Yet, at the same time, it denied its RAND obligations and refused to offer Tellabs a license on RAND terms. (Fuji Testimony, Trial Tr. at 221:4-223:3 (7/17/14).) Treating Tellabs and Ericsson differently is by definition discriminatory—a violation of RAND—and Mr. Fuji, Fujitsu's representative in both cases, was aware of and orchestrated the discrimination.

**C.**     **Fujitsu Planned to Breach its Obligation Instead of Offering Tellabs a License on RAND Terms in Order to Purposefully Damage Tellabs.**

Despite its RAND obligations—which Fujitsu and Mr. Fuji certainly had notice of—Fujitsu filed this lawsuit against Tellabs without ever offering a license to Tellabs. (Fuji Testimony, Trial Tr. at 221:4-14 (7/17/14); Rudofski Testimony, Trial Tr. AM (7/21/14); Joint Ex. 5, at 1 (Fujitsu's demand letter making no license offer to Tellabs).) In fact, Fujitsu never even considered licensing the '737 Patent to Tellabs on RAND terms. (Fuji Testimony, Trial Tr. at 222:25-223:3 (7/17/14).) Instead, Fujitsu planned to "negotiate in a way that we can be the one to initiate" litigation. (Tellabs Ex. 6, at FJ2946345; Fuji Testimony, Trial Tr. at 220:25-221:3 (7/17/14).) Fujitsu planned to sue Tellabs before it even completed technical discussions regarding the '737 Patent, and while still participating in negotiations with Tellabs, Mr. Fuji sent a letter to Mr. Katoh about filing a patent infringement suit "to impart damage on Tellabs' 7100 business." (Fuji Testimony, Trial Tr. at 209:9-13 (7/17/14); Fuji Testimony, Trial Tr. at 336:15-337:7 (7/18/14); Tellabs Ex. 6, at FJ2946344).)

Imparting damage to Tellabs' business was the reason Fujitsu sued Tellabs seeking lost profits, treble damages, and an injunction. (Fuji Testimony, Trial Tr. at 336:15-337:7 (7/18/14); Tellabs Ex. 8, at 4-5, 8 (dated January 29, 2008).) Indeed, any injunction of Tellabs would be devastating to Tellabs and would put them out of business. (Craft Testimony, Trial Tr. at 103:9-21 (7/17/14).) Fujitsu aggressively publicized this lawsuit (Fuji Testimony, Trial Tr. at 254:3-8, 254:17-20 (7/17/14), and the media attention further damaged Tellabs (Craft Testimony, Trial Tr. at 104:7-105:15 (7/17/14)). Throughout this litigation, Fujitsu has never considered licensing the '737 Patent to Tellabs on RAND terms; rather, Fujitsu has denied its obligation and willfully breached its agreement that it was willing to grant a license to the '737 Patent's technology on RAND terms. (Fuji Testimony, Trial Tr. at 222:13-223:3 (7/17/14).)

This is a classic case of patent hold-up. (Simcoe Testimony, Trial Tr. at 360:17-361:16 (7/18/14).) What makes it more troubling, however, is that Fujitsu is discriminatorily targeting a single competitor in order to damage that competitor's business. The evidence clearly and convincingly demonstrates willfulness. In particular, the uncontroverted evidence shows that Fujitsu had knowledge of its RAND agreement, knowledge that the '737 Patent's technology was included in the G.692 standard, and motive and intent to breach its RAND agreement in order to damage Tellabs. With this knowledge, motive, and intent, Fujitsu took purposeful action to breach its agreement and to discriminate against Tellabs. Accordingly, there is no legally sufficient basis for a reasonable jury to find that Fujitsu' beach was not willful under any burden of proof.

## VI.    CONCLUSION.

For all of the foregoing reasons, the Court should grant judgment as a matter of law in favor of Tellabs.

Respectfully submitted on:      By: */s/ James P. Bradley*
July 21, 2014

Richard O'Malley, Jr.
Robert Leighton
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone: 312.853.7000
Facsimile: 312.853.7036

James P. Bradley (*admitted pro hac vice*)
Texas Bar No. 02826000
Li Chen (*admitted pro hac vice*)
Texas Bar No. 24001142
Steven C. Malin (*admitted pro hac vice*)
Texas Bar No. 12859750
Mark A. Dodd (*admitted pro hac vice*)
Texas Bar No. 24040815
Kelley A. Conaty (*admitted pro hac vice*)
Texas Bar No. 24040716
Kristoffer B. Leftwich (*admitted pro hac vice*)
Texas Bar No. 24046285
R. Seth Reich, Jr. (*admitted pro hac vice*)
Texas Bar No. 24088283

**SIDLEY AUSTIN LLP**
2001 Ross Avenue
Suite 3600
Dallas, Texas 75201
Telephone: 214.981.3300
Facsimile: 214.981.3400

**ATTORNEYS FOR**
**TELLABS OPERATIONS, INC., TELLABS, INC.,**
**AND TELLABS NORTH AMERICA, INC.**

## CERTIFICATE OF SERVICE

I certify that, on July 21, 2014, I caused a copy of the foregoing document to be served on counsel of record in this litigation through the Court's ECF system.

_/s/_      _James P. Bradley_