IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FUJITSU LIMITED,<br><br>    Plaintiff,<br><br>v.<br><br>TELLABS OPERATIONS, INC., TELLABS INC, AND TELLABS NORTH AMERICA, INC.,<br><br>    Defendants. | Civil Action No. 1:09-CV-4530<br>Civil Action No. 1:12-CV-3229<br><br>JUDGE HOLDERMAN<br>MAGISTRATE JUDGE COLE<br><br>JURY TRIAL DEMANDED |

**FUJITSU LIMITED'S AMENDED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Fujitsu Limited ("Fujitsu") respectfully requests that the Court enter Judgment as a Matter of Law in favor of Fujitsu Limited on the defense of unenforceability raised by Tellabs Operations, Inc., Tellabs, Inc., and Tellabs North America, Inc. ("Tellabs").

Pursuant to Federal Rule of Civil Procedure 50, judgment as a matter of law is appropriate if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Pandya v. Edward Hosp.*, 1 F. App'x 543, 545 (7th Cir. 2001) (quoting Fed. R. Civ. P. 50). Tellabs has failed to offer sufficient evidence such that a reasonable jury could find in favor of Tellabs on its unenforceability defense related to Fujitsu's U.S. Patent No. 5,521,737.

### I.   Tellabs has failed to prove that Fujitsu agreed to license its '737 Patent's technology on RAND terms through its 1996 Patent Statement.

Fujitsu's representative, Mr. Fuji, testified that the 1996 Patent Statement was not a unilateral offer of '737 Patent technology on RAND terms. Trial Tr., at 282:21–24. Fujitsu provided the 1996 Patent Statement at the specific request of the ITU, in accordance with Fujitsu's disclosure obligations as a member of the ITU. *Id.*, at 277:6–14; 278:9–19; 282:4–16. He testified that Fujitsu conditioned any RAND commitment on reciprocity and the ITU adopting the patent as required to implement to the standard. *Id.*, at 123:8–15; 129:8–15; 283:12–20. There is no evidence that Tellabs ever agreed to reciprocity.

Consequently, Tellabs did not prove that it is entitled to a RAND license under Fujitsu's 1996 Patent Statement. If Tellabs is not entitled to a RAND license, Fujitsu could not be in breach to Tellabs for failing to offer a license on RAND terms including a RAND royalty rate.

**II.  Tellabs has failed to demonstrate that the '737 Patent is essential to one or more of the necessary specifications of the standardized technology in the G.692 Recommendation.**

The ITU requires that a patent not just be "included" in a standard, but that the patent be essential to the relevant standard.  "The purpose of [an ITU member's] commitments to the … ITU, . . . is to ensure that standard essential patents are available" to implement ITU-T recommendations.  *Microsoft v. Motorola*, 864 F. Supp. 2d 1023, 1034 (W.D. Wash. 2012).  Tellabs must prove standard-essentiality on a claim-by-claim basis.  *In re Innovatio IP Ventures, LLC Patent Litigation*, 956 F. Supp. 2d 925, 936-37 (N.D. Ill. July 26, 2013) ("Given that basic attribute of patent law, the promise to license any standard-essential patent must be interpreted as a promise to license only the *standard-essential claims*, the basic unit for evaluation of any patented invention.") (emphasis added).

Tellabs offered Professor Simcoe as an expert in the "field of economics, specifically in the areas of standard-setting organizations and patent policies including the ITU and its patent policies."  Trial Tr., at 354:21-24.  Professor Simcoe testified that with respect to the definition of the term "standard essential," the ITU's policy has not narrowed and has remained the same since 1998, only becoming better defined over the years.  *Id.* at 392:17-393:11.  The ITU's Patent Policy Guidelines state a RAND license to a member's patent need only be extended if the patent is required to practice or implement part or all of a specific Recommendation.  Tellabs Exhibit 16, at FJIL5541835; Tellabs Exhibit 26, at TLTX26361262; Fujitsu Exhibit 22, at 22-22.  According to the Court's jury instructions, this means Tellabs must prove that the '737 Patent is essential to one or more of the necessary specifications of the standardized technology in the G.692 Recommendation.

As the party asserting the affirmative defense based on RAND, Tellabs has the burden to demonstrate that every element of Claim 11 of the '737 Patent is necessary to practice the G.692 Recommendation. *Id.*, at 936. If an element of this claim is not an express requirement of the Recommendation, it is not standard-essential. *Id.*, at 939.

There is no dispute that Claim 11 in the '737 Patent requires the branching of a second optical signal from a first optical signal before the first optical signal enters a rare earth doped optical amplifier. Joint Exhibit 1, at Col. 10:1–2; Trial Tr., at 266:17–267:3 & 691:17–23. Section 5.2.2 of the G.692 Recommendation states one of the "necessary specifications" is that "this channel [meaning optical supervisory channel] shall be capable of being accessed at each amplifier." Joint Exhibit 6, at FJIL5445392. There is no standard or necessary specification in G. 692 for <u>how</u> accessing the optical supervisory signal at the amplifier is to be accomplished. As Dr. Willner, Fujitsu's expert and world-recognized authority on optical amplifiers and optical communication systems, Trial Tr., at 669:24–679:4, explained, Section 5.2.2 of the G.692 Recommendation only specifies that the optical supervisory signal ("OSC") has to be "accessed," but does not say anything about how such accessing is accomplished. *Id.*, at 693:5–15. Prof. Buckman, Tellabs' expert on the same topic, agreed. *Id.*, at 568:3–5. Dr. Willner specifically stated that there is no standardized technology in the G.692 Recommendation regarding how the optical amplifier should access the OSC. *Id.*, at 693:13–25. Of equal significance, the G.692 Recommendation does not require branching of the OSC before the amplifier. *Id.*, at 694:1–4. Again, Prof. Buckman agreed. *Id.*, at 568:6-9. Prof. Buckman refused to equate branching with accessing. *Id.*, at 557:3–5. Both parties' experts on the topic confirmed that even if branching is one way to access the optical amplifier, the G.692 Recommendation has <u>no standard for branching</u>. The '737 Patent, in contrast, is limited to

4

branching the second optical signal, for example the OCS, before the rare-earth doped fiber. Joint Exhibit 1, Col. 10:1–2; Trial Tr., at 266:17–267:3 & 691:17–23.

The G.692 Recommendation only requires the OSC to be accessed by the optical amplifier, and nothing more. Trial Tr., at 556:23–557. Prof. Buckman (whose experience with optical amplifiers is very limited, *see id.*, at 546:25–556:16) stated that he did not know if an optical supervisory signal could be extracted in an erbium-doped fiber amplifier ("EDFA") without branching. *Id.*, at 568:10–15. Dr. Willner – again a world-recognized authority on optical amplifiers – confirmed that an OSC can in fact be accessed in an erbium-doped optical amplifier without branching, by using an in-line detector. *Id.*, at 694:21–695:9. Moreover as acknowledged by Prof. Buckman, an OSC at the preferred wavelength of 1510 nanometers ("nm") identified in Section 5.2.2 of G.692 could be accessed **after** passing through an EDFA if it was amplified enough. *Id.*, at 567:7–12. Dr. Willner explained why this is so. The doped fiber adds as much in gain to the 1510 nm optical supervisory signal as it takes away in absorption, leaving the 1510 nm optical supervisory signal fully available for branching and detection after the doped fiber. *Id.*, at 703:10–19: Dr. Willner also explained that <u>even if the amplifier breaks</u> and 90% of the 1510 nm optical supervisory signal is lost in the doped fiber, enough of the 1510 nm optical supervisory signal can be recovered after the doped fiber to put to use. *Id.*, 708:4–21. It is therefore not necessary or required to branch the optical supervisory signal, even at the suggested wavelength of 1510 nm, **before** it reaches the doped fiber. *Id.*, 709:4–6. This testimony is uncontroverted.

The testimony and exhibits entered into evidence[1] accordingly establish that Tellabs has failed to prove by a preponderance of the evidence that the technology of the '737 Patent is required to implement a necessary specification (*i.e.*, accessing the OSC by the optical amplifier) of the G.692 Recommendation.

### III. Assuming there was a RAND obligation, Tellabs has failed to prove Fujitsu breached this obligation.

Tellabs has failed to prove that Fujitsu not offering Tellabs a RAND royalty for the '737 Patent is a breach of an alleged RAND obligation. As stated in Section I, above, Tellabs has failed to prove it is entitled to a RAND license because it presented no testimony that it ever agreed to reciprocity as required by Fujitsu's 1996 Patent Statement. If Tellabs is not entitled to a RAND royalty, Fujitsu cannot be in breach for failing to offer one. Furthermore, as discussed in Section IV, below, Tellabs refused to negotiate any license with Fujitsu, regardless of royalty rate. Fujitsu cannot be in breach of an obligation when it was refused the opportunity to comply with it.

Tellabs has failed to prove that seeking injunctive relief is a breach of Fujitsu's alleged RAND obligation. Fujitsu's RAND and economic expert, Dr. Schmalensee another world-recognized authority, *see*, Trial Tr., at 742:11–748:9, explained that a patent holder's decision not to provide a RAND royalty when there are alternatives to implementing a standardized technology without using the patent holder's patent does not violate the purpose of RAND obligations. *Id.*, at 760:10–761:21. Furthermore, merely asking for an injunction is not a violation of a RAND obligation according to controlling precedent. *Apple Inc. v. Motorola, Inc.*,

---

[1] Under the Court's limiting instruction, Tellabs' introduction of slides from Fujitsu's negotiations with Ericsson, slides that Tellabs says demonstrate the coextensive nature of the '737 Patent and G.692 Recommendation, are inadmissible for the purpose of establishing Fujitsu's RAND liability. Trial Tr., at 186:15–187:2 & 639:6–12.

6

-- F.3d --, Nos. 2012-1548, 2102-1549, 2014 WL 1646435 (Fed. Cir. April 25, 2014). In *Apple*, the Federal Circuit expressly overruled the trial Court's determination that requesting an injunction is fundamentally inconsistent with RAND. *Apple Inc.*, -- F.3d --, 2014 WL 1646435, at *35 & at *36 (Rader C.J., dissenting on result). The Federal Circuit held that an injunction may be appropriate depending on the facts of the case, such as when the purported RAND licensee refuses or unreasonably delays RAND negotiations. *Id.*, at *35 & at *36. Prof. Simcoe's contrary testimony must be disregarded as against binding precedent.

Tellabs has failed to prove that seeking a non-RAND royalty or seeking damages in the form of lost profits in litigation is a breach of an alleged RAND obligation. As explained by Dr. Schmalensee, a patent holder's decision not to provide a RAND royalty when there are alternatives to implementing a standardized technology without using the patent holder's patent does not violate the purpose of RAND obligations. Trial Tr., at 760:10–761:21.

Tellabs has failed to prove that alleging infringement of the '737 Patent damaged Tellabs's business and is thus constitutes a breach of an alleged RAND obligation. Tellabs has presented no evidence that Fujitsu's alleged desire to damage Tellabs' business has anything to do with an alleged RAND obligation. When there are alternatives to implementing a standardized technology without using the patent holder's patent, the fact that Tellabs' business may have been damaged does not mean RAND issues are raised. *Id.*, at 760:10–761:21.

Tellabs has failed to prove that alleging infringement of the '737 Patent required Tellabs to devote management attention and time, as well as other resources to defending the lawsuit, such as attorney's fees, expert fees, and related costs and therefore constituted a breach of an alleged RAND obligation. While Tellabs has elicited testimony that it incurred costs in defending this lawsuit, there has been no evidence presented that this is a breach of a RAND obligation. When there are alternatives to implementing a standardized technology without using the patent

7

holder's patent, the fact that Tellabs' business may have been damaged does not mean RAND issues are raised. *Id.*, at 760:10–761:21.

### IV. Assuming there was a RAND obligation for the '737 Patent, Tellabs has failed to prove that it was a willing licensee.

In addition to having to prove that the '737 Patent was essential, Tellabs is required to prove that it would have been willing to license Fujitsu's '737's Patent Technology from Fujitsu on RAND terms, if Fujitsu had offered Tellabs RAND terms for such a license. *See Apple*, 2014 WL 1646435, at *35 (noting that an injunction may be justified where an infringer unilaterally refuses a RAND royalty); *id.* at *36 (J. Rader, dissenting) (discussing when a patent-holder is justified in seeking an injunction); *Ericsson, Inc. v. D-Link Sys.*, 6:10-CV-473, 2013 WL 4046225, *16 (E.D. Tex. Aug. 6, 2013) ("Intel cannot rely on its failure to negotiate to prove Ericsson's failure to make a legitimate license offer.")

The undisputed evidence is that Tellabs refused to engage in business discussions with Fujitsu regarding the '737 Patent in 2007. Tellabs' in-house lawyer, Mr. Rudofski, testified he never communicated to Fujitsu that Tellabs was willing to take a RAND license for the '737 Patent, despite Fujitsu indicating it would do so on other patents. Trial Tr., at 453:12–14; 454:4–24. Tellabs failed to raise the question of a RAND license with Fujitsu regarding the '737 Patent until 2013. *Id.*, at 455:20–23. Mr. Rudofski admitted that he refused to engage in business discussions with Fujitsu. *Id.*, at 464:13–25 ("[Mr. Fuji] invited us to another meeting. It may have been a face-to-face that he suggested. But I do recall declining his invitation.") Mr. Rudolfski stated that he would not engage in any business discussions concerning a license if Fujitsu continued to allege that Tellabs' products infringed Fujitsu's patents. *Id.*, at 465:11–17 & 476:18–477:11.

8

Mr. Rudofski's testimony plainly demonstrates that Tellabs was <u>not</u> willing to negotiate a license of any sort with Fujitsu, RAND or not. Mr. Rudofski's testimony about the contacts between Fujitsu and Tellabs reveals the Catch-22 Tellabs wishes to impose on Fujitsu: the only condition under which Mr. Rudofski says Tellabs would have agreed to negotiate with Fujitsu was if Fujitsu agreed that Tellabs was not infringing Fujitsu's patents … but then, of course, no license would have been needed by Tellabs at all. Mr. Rudofski's testimony demonstrates that Tellabs was only interested in one outcome – that Tellabs would not take a license. Mr. Rudofski went on to testify that despite allegedly being willing to license the '737 Patent, he never obtained authority to resolve the dispute over the '737 Patent. *Id.*, 475:20–476:4. In fact, there is no testimony that Tellabs has ever accepted a royalty, RAND or otherwise, for its claimed compliance with the G.692 Recommendation, despite the existence of other companies' patents disclosed in connection with G.692. *Id.*, 481:25–482:14.

Tellabs' refusal to begin licensing negotiations is confirmed by the testimony of Mr. Fuji, Fujitsu's negotiator with Mr. Rudofski regarding Fujitsu's patents. Mr. Fuji testified that the purpose of the February 2007 demand letter, Joint Exhibit 5, was to negotiate a business resolution to Fujitsu's determination that Tellabs infringed Fujitsu's patents. *Id.*, at 616:3–7. After completing their discussions regarding the technical aspects of Fujitsu's patents, Mr. Fuji suggested a face-to-face meeting "to move to the next stage of negotiation." *Id.*, at 628:23–629:10. By "face-to-face meeting," Mr. Fuji meant discussing the licensing of Fujitsu's patents. *Id.*, at 629:14–18. Mr. Rudofski refused to meet after this request by Mr. Fuji. *Id.*, at 629:11–13. Fujitsu was never able to present Tellabs with any license demand, RAND or otherwise, because Tellabs was unwilling and refused to negotiate. *Id.*, at 221:4–14 ("We were never given an opportunity to do so. Tellabs didn't want to get into discussions of that sort."); 663:15–17.

9

The testimony of both Tellabs and Fujitsu witnesses clearly establishes that as soon as Fujitsu broached the topic of Tellabs accepting a license for Fujitsu's patents, Tellabs shut down negotiations. Tellabs simply refused to negotiate. Fujitsu cannot be held responsible for Tellabs refusal to come to a business resolution.

## V. Assuming there was a RAND obligation that Fujitsu breached, Tellabs has failed to prove that Fujitsu acted willfully.

The evidence overwhelmingly shows that, assuming a RAND obligation existed, Fujitsu did not willingly breach it.

The January 2007 Katoh Report, an internal Fujitsu memorandum, clearly reflects that Fujitsu did not believe the '737 Patent was standard-essential. Trial Tr., at 316:4–13; Fujitsu Exhibit 50, at 50-2 (identifying other Fujitsu patents as standard essential); Fujitsu Exhibit 51, at 51-5 & 51-8. Furthermore, Tellabs' argues that Fujitsu was only interested in filing a lawsuit against Tellabs and never intended to offer a license. Tellabs' argument does not square with the facts. The January 2007 Katoh Report, an internal memorandum created before Fujitsu sent its notice letter to Tellabs, clearly states in the "Offer to License" section that Fujitsu, in fact, contemplated licensing its patents to Tellabs. Fujitsu Exhibit 50, at 50-3.

The November 2007 Katoh Report reflects that Fujitsu resorted to litigation as a last resort because Tellabs refused to engage Fujitsu in any discussions about licenses. Tellabs Exhibit 6, at FJ2946344 ("Tellabs refuses to meet face to fact and to present opinions in writing. Going forward, we believe it would be unlikely for them to be amenable to business discussions."). The November 2007 Katoh Report also does not refer to the '737 Patent being standard essential, while listing other patents that Fujitsu did consider essential. *Id.*

Fujitsu offered a RAND license to Tellabs on a separate patent that Fujitsu determined was standard-essential. Trial Tr., at 624:23–625:8. Fujitsu, however, did not list the '737 Patent

10

as standard essential in the February 2007 demand letter to Tellabs despite listing other Fujitsu patents as standard essential. Joint Exhibit 5. Nor should it have. Fujitsu did not believe in February 2007 that the '737 Patent was obligated under a RAND commitment regarding the G.692 Recommendation. Joint Exhibit 5; Trial Tr., at 618:20–619:2. This is because the second signal branching limitation required by the '737 Patent claims is not disclosed as part of a "necessary specification" of a "standardized technology" in the G.692 Recommendation. Trial Tr., at 222:17–24; 188:16–22;

Tellabs' arguments regarding Fujitsu's alleged ill will toward Tellabs is only a smoke screen. The facts are clear that Fujitsu did not consider the '737 Patent essential to the G.692 Recommendation. With this honest and reasonable belief, any RAND breach, if one exists at all, cannot be willful.

WHEREFORE, Fujitsu Limited respectfully requests that the Court enter Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50 in favor of Fujitsu Limited and against Tellabs on the defense of unenforceability as to U.S. Patent No. 5,521,737.

Dated: July 23, 2014

Respectfully Submitted,

*/s/ David C. Van Dyke*

David C. Van Dyke

David C. Van Dyke // Joseph W. Barber
Emily E. Bennett

Howard & Howard Attorneys PLLC
200 South Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 456-3641
Facsimile: (312) 939-5617
Email: dvd@h2law.com
Email: jwb@h2law.com

Email: eeb@h2law.com

James C. Brooks // Michael D. Owens
Orrick, Herrington & Sutcliffe, LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017-5855
Telephone: (213) 629-2020
Facsimile: (213) 612-2499
Email:   jbrooks@orrick.com
Email:   mowens@orrick.com

Mark P. Wine //Mark J. Shean // Glen Liu
Orrick, Herrington & Sutcliffe, LLP
2050 Main Street, Suite 1100
Irvine, CA 92618
Telephone: (949) 567-6700
Facsimile: (949) 567-6710
Email:   mwine@orrick.com
Email:   mshean@orrick.com
Email:   gliu@orrick.com

***Attorneys for* FUJITSU LIMITED**

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2014, I provided service to all counsel by causing a true and correct copy of **FUJITSU LIMITED'S AMENDED MOTION FOR JUDGMENT AS A MATTER OF LAW** to be served on all counsel of record by the Court's CM/ECF System.


Dated: July 23, 2014
                *s/ David C. Van Dyke*
                David C. Van Dyke (#6204705)
                Howard & Howard Attorneys PLLC
                200 South Michigan Ave. Suite 1100
                Chicago IL 60604
                Telephone: (312) 456-3641
                Facsimile: (312) 939-5617
                Email: dvd@h2law.com