IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FUJITSU LIMITED,

      Plaintiff,

v.

TELLABS OPERATIONS, INC., TELLABS
INC, AND TELLABS NORTH AMERICA,
INC.,

      Defendants.

Civil Action No. 1:09-CV-4530
Civil Action No. 1:12-CV-3229
Civil Action No. 1:13-CV-4991

JUDGE HOLDERMAN
MAGISTRATE JUDGE COLE

JURY TRIAL DEMANDED

**FUJITSU LIMITED'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
PURSUANT TO FED. R. CIV. P. 50(B) ON TELLABS' UNENFORCEABILITY AFFIRMATIVE
DEFENSE**

Fujitsu Limited ("Fujitsu") respectfully renews, pursuant to Federal Rule of Civil Procedure 50(b), its request that, notwithstanding the jury verdict, the Court enter Judgment as a Matter of Law in favor of Fujitsu Limited on Tellabs Operations, Inc.'s, Tellabs, Inc.'s, and Tellabs North America, Inc.'s ("Tellabs") affirmative defense of unenforceability. Tellabs failed to meet its burden on any of the questions posed to the jury, and cannot demonstrate a legally sufficient evidentiary basis for a reasonable jury to find otherwise. As a result of Tellabs' failure to meet its burden, the Court should enter a judgment as a matter of law in favor of Fujitsu on Tellabs' unenforceability defense to Fujitsu's U.S. Patent No. 5,521,737 ("the '737 Patent").

## I.    LEGAL STANDARDS

"A court should render judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000); *Pandya v. Edward Hosp.*, 1 F. App'x 543, 545 (7th Cir. 2001). To prevail on a renewed motion for judgment as a matter of law following a jury trial, "a party must show that the jury's findings are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied by the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984)); *see also Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922 (7th Cir. 2009). Substantial evidence "is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer*, 732 F.2d at 893. In evaluating a motion for judgment as a matter of law, the "court must consider all the evidence in a light most favorable to the non-mover, must draw reasonable inferences favorable to the non-mover, must not determine credibility of witnesses,

and must not substitute its choice for that of the jury between conflicting elements in the evidence." *Id.*; *Massey*, 226 F.3d at 924.

Tellabs failed to offer sufficient evidence such that a reasonable jury could answer "yes" to any of the questions posed to the jury during the July 2014 trial.[1]  The Court should therefore enter judgment as a matter of law in favor of Fujitsu.[2]

## II.    BACKGROUND

In January 2008, Fujitsu filed a complaint alleging that Tellabs infringes the '737 Patent. On May 1, 2013, Tellabs asserted its Fifth Affirmative Defense of "Estoppel/Offer of FRAND License to Industry."  Case No. 12-cv-03229 [Dkt. 48].  This was the first time Tellabs had argued that Fujitsu's claims for damages were barred or limited based on Fujitsu's representations to a standard-setting organization that Fujitsu would license patents on RAND terms. *Id.* at ¶ 76.

On June 12, 2014, the Court ordered: "The general issue to be tried at the July jury trial pursuant to Fed. Rule Civil Pro. 42(b) is: Whether Fujitsu breached its commitment regarding the '737 Patent to the ITU and the IEEE? Within the context of that general issue to be decided by the jury at the July trial will be the question of Fujitsu's intent: whether or not Fujitsu was willful

---

[1]    Fujitsu submits its Renewed Motion for Judgment as a Matter of Law pursuant to Rule 50(b) based on the evidence allowed at trial and the instructions and verdict form actually submitted to the jury.  In doing so, Fujitsu does not waive its rights regarding its challenges to the legal and/or evidentiary rulings made by the Court prior to and during the course of trial, including but not limited to the legal determinations made regarding jury instructions and the verdict form supplied to the jury. Fujitsu has already preserved those objections, and, in any event, they need not be re-raised under Rule 50(b).  Fujitsu also maintains that even if the Court finds that the jury's findings were supported by substantial evidence, the legal conclusions implied there from cannot be supported in law.

[2]    Fujitsu recognizes that the Court denied its Rule 50(a) Motion for Judgment as a Matter of Law, which was filed after the conclusion of Tellabs' case in chief but prior to the jury reaching a verdict.  Upon further detailed review of the record, Fujitsu maintains its position that judgment as a matter of law should be granted in its favor, as the trial record contains such inadequate proof that no reasonable jury could find in Tellabs' favor.   Fujitsu therefore respectfully asks the Court to consider its Renewed Motion for Judgment as a Matter of Law pursuant to Rule 50(b).

in committing any breach found by the jury of Fujitsu's written commitments to the ITU or IEEE regarding Fujitsu's '737 Patent?"  Case No. 09-cv-04530 [Dkt. 1258].  The jury trial began on July 15, 2014.  [Dkt. 1396].  The jury returned a verdict on July 23, 2014 in favor of Tellabs and against Fujitsu.  [Dkt. 1410].  The jury answered "yes" to each of the questions on the jury verdict form.

## III.    ARGUMENT

### A.    No reasonable jury could find that Fujitsu unconditional agreed to license the '737 Patent on RAND terms through its 1996 Patent Statement.

In 1996 Fujitsu submitted a letter to the ITU-T, of which it was a member, drawing attention to certain patents which may be related to various standards that were under development at that time (the "1996 Patent Statement").  Joint Ex. 2.  Fujitsu's corporate representative, Mr. Hitoshi Fuji, testified that the 1996 Patent Statement was not a unilateral offer to license the '737 Patent on RAND terms.  Trial Tr., at 282:21–24.  Rather, Fujitsu provided the 1996 Patent Statement at the specific request of Working Group 15 of the ITU-T in order to fulfill Fujitsu's disclosure obligation as a member of the ITU-T.  *Id.* at 277:6–14; 278:9–19; 282:4–16.  In the 1996 Patent Statement, Fujitsu only stated that it was willing to license certain patents for the purpose of implementation of adopted ITU-T Recommendations.  *Id.* at 281:5-8; 283:12-20.  Tellabs failed to prove that there was any consideration offered by the ITU-T, or that there was a valid offer and acceptance which would create a contract benefiting Tellabs.  Even if there was a valid offer and acceptance in Fujitsu's submission of the 1996 Patent Statement to the ITU-T, Mr. Fuji testified that Fujitsu's agreement to license the '737 Patent on RAND terms was, consistent with ITU-T policies, conditioned on the adoption of a standard to which the '737 Patent is essential and reciprocity by the implementer of the relevant ITU-T Recommendation.  *Id.* at 123:8–15; 129:8–15; 282: 21-24; 283:12–20.  The 1996 Patent

Statement clearly states that Fujitsu's willingness to license was extended in compliance with the ITU-T Patent Policy, and *only* to implementers of the particular ITU-T Recommendation. Joint Exhibits 2 and 3.

In light of the conditional nature of Fujitsu's 1996 Patent Statement, Tellabs was required to but did not offer any evidence by which a reasonable jury could find that the '737 Patent was essential to ITU-T G.692, as argued below. Tellabs also did not offer credible evidence from which a reasonable jury could find that the Tellabs 7100 product which includes the accused optical amplifier modules practices the G.692 Recommendation. The only testimony on whether the accused Tellabs product actually practices the G.692 Recommendation was provided by Mr. Kenneth Rudofski, Assistant General Counsel for Intellectual Property at Tellabs, who stated his belief that Tellabs "markets compliance" with respect to the G.692 Recommendation. Trial Tr. 471:18-472:3. Tellabs did not offer any technical testimony regarding actual compliance with the ITU-T G.692 Recommendation. Without evidence that the Tellabs 7100 product line actually practices the ITU-T G.692 Recommendation using the '737 Patent, a reasonable jury could not find that Fujitsu was obligated to offer to license the '737 Patent to Tellabs on RAND terms. Moreover, Tellabs failed to produce any evidence that it agreed to reciprocity, as required under ITU-T Patent Policy Option 2.2. Joint Ex. 3, at Annex 2.

Because the 1996 Patent Statement was conditional, and Tellabs failed to demonstrate that the relevant conditions were met, no reasonable jury could find that Fujitsu, through the 1996 Patent Statement, promised to license its '737 Patent on RAND terms. Judgment as a Matter of Law should be entered in Fujitsu's favor.

**B.      No reasonable jury could find that the '737 Patent is essential to one or more of the necessary specifications of the standardized technology in ITU G.692 Recommendation.**

ITU-T Patent Policy is designed to "assure[ ] that Recommendations … are accessible to everybody;" hence "**monopolistic abuse** by a holder of a patent **embodied** fully or partly **in a Recommendation must be excluded**."  Joint Ex. 3, at Annex 2.  Accordingly, "[t]he purpose of [an ITU-T member's] commitments to the … ITU, ... is to ensure that standard essential patents are available" to implement ITU-T recommendations.  *Microsoft v. Motorola*, 864 F. Supp. 2d 1023, 1034 (W.D. Wash. 2012).  Tellabs must prove standard-essentiality on a claim-by-claim basis.  *In re Innovatio IP Ventures, LLC Patent Litig.*, 956 F. Supp. 2d 925, 936-37 (N.D. Ill. 2013) ("Given that basic attribute of patent law, the promise to license any standard-essential patent must be interpreted as a promise to license only the *standard-essential claims*, the basic unit for evaluation of any patented invention." (emphasis added)).  Fujitsu's allegations of infringement of Claims 11 and 12 of the '737 Patent remained pending against Tellabs at the time of the July 2014 trial.

As the party asserting the affirmative defense based on RAND, Tellabs had the burden to demonstrate that every element of Claim 11 of the '737 Patent is necessary to practice the G.692 Recommendation.  *See Innovatio IP Ventures,* 956 F. Supp. 2d at 936.  If practice of the patent claim is not expressly required to implement an ITU-T Recommendation, it is not standard-essential.  *See id.* at 939.

Tellabs called Professor Timothy Simcoe to testify as an expert in the "field of economics, specifically in the areas of standard-setting organizations and patent policies including the ITU and its patent policies."  Trial Tr., at 354:21-24.  Professor Simcoe explained that the definition of "standard essential," in the ITU-T's policy has remained the same since

1998 when the G.692 Recommendation was adopted, and even since 1996 when Fujitsu submitted its Patent Statement, only becoming better defined over the years. *Id.* at 392:17-393:11. In particular, the ITU-T's Patent Policy Guidelines state that a RAND license to a member's patent need only be extended if the patent would be required to implement a particular approved Recommendation. Tellabs Ex. 16, at FJIL5541835; Tellabs Ex. 26, at TLTX26361262. Tellabs' RAND expert Professor Simcoe agreed:

A. … [T]he intent of the policy hasn't changed, but they have updated the language. Specifically, with respect to the term "essential" there is a place in one of the forms. So now the ITU-T has standardized the form that a patent holder uses to submit its patent statements. … And there is a place on one of those forms that discusses the term "essential."

\*                           \*                           \*

Q. In general, "A standard essential patent is a patent protecting an invention required to practice a given industry standard so that infringing essential patent claims is unavoidable when implementing the standard." That's correct, isn't it?

A. I think that's a way to define "essential."

Q. It's a way with which you agree because that obviously comes from an article that was commissioned pursuant to your position on the committee on intellectual property management and standard setting process, right, Professor Simcoe?

A. Yes.

Trial Tr., at 392:20-393:22. Here, Tellabs failed in its burden to prove that the '737 Patent is "essential" to one or more of the necessary specifications of the standardized technology in the ITU G.692 Recommendation.

Claim 11 in the '737 Patent requires the branching of a second optical signal from a first optical signal before the first optical signal enters a rare earth-doped optical amplifier. Joint Ex. 1, at Col. 10:1–2; Trial Tr., at 266:17–267:3 and 691:17–23. Section 5.2.2 of the G.692 Recommendation, in contrast, merely states as a "necessary specification" that an optical

6

supervisory channel "shall be capable of being accessed at each amplifier." Joint Ex. 6, at FJIL5445392.

Recommendation G.692 is silent – and therefore does not expressly include a "necessary specification" – regarding how accessing the optical supervisory signal at the amplifier is to be accomplished. Dr. Allan Willner, Fujitsu's technical expert and world-renowned authority on optical amplifiers and optical communication systems, Trial Tr., at 669:24–679:4, explained to the jury that Section 5.2.2 of the G.692 Recommendation only specifies that the optical supervisory signal ("OSC") be "accessed." *Id*. at 693:5–15. The G.692 Recommendation does not specify how such accessing must be accomplished. *Id*. at 693:5–15. Professor Bruce Buckman, Tellabs' technical expert on the same topic, agreed. *Id.* at 568:3–5.

Dr. Willner clearly testified that the G.692 Recommendation does not specify any standardized technology regarding how the optical amplifier should access the OSC. *Id.* at 693:13–25. The G.692 Recommendation simply does not require branching of the OSC before the amplifier. *Id.*, at 694:1–4. Again, Professor Buckman agreed. *Id.*, at 568:6-9. Professor Buckman actually refused to equate branching with accessing. *Id.*, at 557:3–5. Both parties' technical experts confirmed that even if branching is one way to access the optical amplifier, the G.692 Recommendation does not specify or include a standard for branching. In sum, the technical experts are in accord that the G.692 Recommendation only requires the OSC to be "accessed" by the optical amplifier, and nothing more. *Id.*, at 556:23–557.

As noted, the '737 Patent claims branching the second optical signal, for example the OCS, before the rare-earth doped fiber. Joint Ex. 1, Col. 10:1–2; Trial Tr., at 266:17–267:3 and 691:17–23. Professor Buckman (whose experience with optical amplifiers is very limited, *see id.* at 546:25–556:16) did not know if an optical supervisory signal could be extracted in an

erbium-doped fiber amplifier ("EDFA") without branching. *Id.* at 561:6-13. Dr. Willner confirmed that an OSC can in fact be accessed in an erbium-doped optical amplifier without branching, by using an in-line detector. *Id.* at 694:21–695:9. In fact, Dr. Willner published on the principle of in-line detecting in 1993 and obtained a patent on the principle of in-line detecting in 1996. *Id.*, at 695:5-8.

Professor Buckman acknowledged that an OSC at the preferred wavelength of 1510 nanometers ("nm") identified in Section 5.2.2 of G.692 could be accessed **<u>after</u>** passing through an EDFA if it was sufficiently amplified. *Id.* at 567:7–12. Dr. Willner agreed and explained to the jury that when the optical amplifier is operating, the doped fiber adds as much in gain to the 1510 nm optical supervisory signal as it takes away in absorption, leaving the 1510 nm optical supervisory signal fully available for branching and detection after the doped fiber. *Id.* at 703:10–19 and 707:16-708:3. Dr. Willner explained that **<u>even if the amplifier breaks</u>** and 90% of the 1510 nm optical supervisory signal is lost in the doped fiber, enough of the 1510 nm optical supervisory signal can be recovered after the doped fiber to put to use. *Id.*, at 708:4–21. Consequently, Tellabs did not have to practice the method of Claim 11 of the '737 Patent, with its step of branching a "second" (*e.g.*, optical supervisory) signal before the doped fiber, in order to meet the G.692 Recommendation of using a 1510 nm optical supervisory signal and "accessing" that signal at the optical amplifier. *Id.*, at 709:4-6.

The undisputed testimony from the technical experts was that branching the optical supervisory signal before it reaches the doped fiber is not a necessary or required specification of the G. 692 Recommendation, even at the suggested wavelength of 1510 nm. *Id.*, at 709:4–6. Even taking all of the evidence in the light most favorable to Tellabs, this uncontroverted testimony is so clear that no reasonable jury could find that branching is a necessary

specification of ITU G.692 Recommendation, and no reasonable jury could find that the technology of the '737 Patent is required to implement a necessary specification (*i.e.*, accessing the OSC by the optical amplifier) of the G.692 Recommendation. The '737 Patent therefore cannot be standard essential to the G.692 Recommendation, which in turn means Fujitsu was not obligated to license the '737 Patent on RAND terms. Accordingly, Judgment as a Matter of Law should be entered in favor of Fujitsu. [3]

### C. No reasonable jury could find that Fujitsu breached any RAND obligation.

First and foremost, because no reasonable jury could find that Fujitsu had a RAND obligation with respect to the '737 Patent for purpose of implementing ITU G.692 Recommendation, Fujitsu cannot be in breach for failing to offer Tellabs a license on RAND terms or by filing the instant action. Even if the Court concludes that Fujitsu was required to offer to license the '737 Patent to Tellabs on RAND terms for use in 7100 Products, Tellabs failed to prove that Fujitsu breached that RAND obligation. Thus, no reasonable jury could find that Fujitsu breached a RAND obligation, particularly not in the ways specified in Jury Question # 3.

Tellabs did not introduce any evidence showing that Fujitsu agreed that it would never sue an implementer of G.692 if that entity was infringing the '737 Patent without a license.

---

[3] To the extent the jury may have relied upon certain slides from presentations made by Fujitsu to a third-party, Ericsson, to conclude that the '737 Patent is in fact standard-essential to the G.692 Recommendation, that is a violation of the Court's limiting instruction given when the court admitted the Ericsson slides into evidence over Fujitsu's objection. The Court instructed the jury that the Ericsson slides (Tellabs Trial Exhibits 10A, 11A, and 17A), which depicted an incomplete comparison of Claim 11 of the '737 Patent to G.692 (because Ericsson products allegedly complied with G.692), were admitted into evidence "for the *limited purpose* of [the jury's] consideration of the issue of Fujitsu's knowledge and Fujitsu being on notice that the '737 patent may be required to implement one or more of the necessary specifications of the ITU recommendation G.692…" Trial Tr., at 186:15–187:2; 639:6–12 (emphasis added).

Tellabs did not prove that the act of requesting injunctive relief was a breach of Fujitsu's alleged RAND obligation. Fujitsu's RAND and economics expert, Dr. Richard Schmalensee, another world-renowned authority, *see*, Trial Tr., at 742:11–748:9, explained that a patent owner's decision to file suit and seek injunctive relief when there are alternatives to implementing a standardized technology without using the patent owner's patent does not violate the purpose of RAND obligations. *Id.* at 760:10–761:21. A RAND obligation is not permission to infringe for free. Where an alleged infringer uses the patented technology without taking a license, the patent owner is not *per se* barred from seeking an injunction. *Apple Inc. v. Motorola, Inc.*, -- F.3d --, Nos. 2012-1548, 2102-1549, 2014 WL 1646435 (Fed. Cir. April 25, 2014). In *Apple*, the Federal Circuit expressly overruled the trial court's determination that requesting an injunction is fundamentally inconsistent with RAND. *Apple Inc.*, 2014 WL 1646435, at *35 & at *36 (Rader C.J., dissenting only as to result). The Federal Circuit held that an injunction may be appropriate depending on the facts of the case, such as when the purported RAND licensee refuses or unreasonably delays RAND negotiations. *Id.* at *35-36. Any testimony offered at trial by Tellabs' Professor Simcoe contrary to this controlling legal precedent must be disregarded.

Tellabs likewise failed to prove that Fujitsu's decision to seek damages in the form of a non-RAND royalty rate or lost profits upon commencement of legal action is a breach of any alleged RAND obligation. There is no evidence that Fujitsu agreed its opening demand would always be a RAND rate (particularly given that RAND rates are not concrete or easily identifiable). There is also no evidence that Fujitsu agreed to never demand lost profits against an alleged infringer in the course of litigation if the infringer refuses to pay.

The RAND obligation for a patent applies when an entity, whose accused products implement a standard, must practice the patent at issue in order to do so. Where an accused

infringer is not required to use a particular patent, the policies of RAND are not violated by a request for legal relief which includes monetary damages beyond a RAND royalty rate. As explained by Dr. Schmalensee, where there are ways to implement a recommendation without using the particular patented technology, concerns regarding hold-up are minimized. Trial Tr., at 756:9-15; 760:10–761:21. In light of the undisputed testimony, § III.B, *supra*, that an implementer of the G.692 Recommendation does not need to use the '737 Patent, no reasonable jury could find that Fujitsu breached a RAND obligation by requesting damages other than a RAND royalty rate.

With respect to the impact of Fujitsu filing a lawsuit against Tellabs (Jury Questions 3.e and 3.f), no reasonable jury could find that any such <u>impact</u> constituted a RAND breach. Tellabs did not offer any evidence, through Professor Simcoe or otherwise, that the impact of filing of a lawsuit relates to a RAND obligation. Whether or not a contractual breach occurs should be limited to the <u>actions</u> taken by the allegedly breaching party. Tellabs has not proven, through Professor Simcoe or otherwise, that the results of legal action demonstrate a breach of a RAND obligation. While Tellabs elicited testimony that it incurred (undocumented) costs in defending this lawsuit, there was no evidence that those costs constitute a breach of a RAND obligation. Additionally, even if the impact of legal action matter with respect to finding a RAND breach (which it does not), no reasonable jury could find that Tellabs' business was damaged by commencement of legal action. The sole testimony on this point, offered by Mr. Kenneth Craft, Tellabs' corporate witness, was that Tellabs had to make certain representations and warranties in the market, and that if an injunction had issued (which it never did) Tellabs <u>would have</u> been damaged. Trial Tr. 102:18-103:21. <u>Mr. Craft testified that Tellabs has not actually incurred any</u>

liability as a result of this lawsuit. *Id.* at 115:3-6. A reasonable jury could not find that Fujitsu breached a RAND obligation based on harm that has not occurred.

Even where Tellabs sought to offer broad statements regarding business harm to Tellabs and the amount of time that was necessary to defend the lawsuit, the only testimony offered was that the lawsuit, as a whole, had an impact on Tellabs. As Tellabs made clear, the January 2008 suit included infringement allegations related to *several* Fujitsu patents. Tellabs Trial Ex. 8. Tellabs failed to offer any evidence establishing a direct connection between business harm resulting from allegations of infringement of the '737 Patent, as opposed to harm related to the other patents-in-suit, nor did Tellabs offer any evidence that management time and resources were related directly to litigating the '737 Patent. Regarding the alleged decrease in Tellabs' market share during the pendency of the lawsuit, *id.* 97:15 – 98:4, there was no evidence whatsoever introduced to show a causal link between the lawsuit and any decrease in Tellabs' market share. No reasonable jury could find in favor of Tellabs and against Fujitsu on Jury Question #3. Judgment as a Matter of Law should be entered in favor of Fujitsu.

**D.      No reasonable jury could find that Tellabs was a willing licensee.**

Tellabs further had the burden to prove that it would have been willing to take a license to Fujitsu's '737 Patent on RAND terms for the purpose of implementing the ITU G.692 Recommendation. *See Apple*, 2014 WL 1646435, at *35 (an injunction may be justified where an infringer unilaterally refuses a RAND royalty); *Ericsson, Inc. v. D-Link Sys.*, 6:10-CV-473, 2013 WL 4046225, at *16 (E.D. Tex. Aug. 6, 2013) ("Intel cannot rely on its failure to negotiate to prove Ericsson's failure to make a legitimate license offer.").

The undisputed evidence is that Tellabs refused to engage in license discussions with Fujitsu regarding the '737 Patent in 2007. Tellabs' in-house lawyer, Mr. Rudofski, testified that

he never communicated to Fujitsu that Tellabs was willing to take a license on RAND terms for the '737 Patent, despite Fujitsu indicating that it was willing to license other patents which were in fact standard-essential on RAND terms and Fujitsu never asked Tellabs to stop shipping its product. Trial Tr., at 453:12–14; 454:4–24. Tellabs did not raise its argument that the '737 Patent is RAND obligated until 2013, six years after the negotiations during which Tellabs now claims it was willing to negotiate a RAND license. *Id.* at 455:20–23.

Critically, Mr. Rudofski admitted that he <u>refused to engage in business discussions with Fujitsu</u>. *Id.* at 464:13–25 ("[Mr. Fuji] invited us to another meeting. It may have been a face-to-face that he suggested. But I do recall declining his invitation."). Mr. Rudofski stated that he would not engage in any business discussions concerning a license if Fujitsu continued to allege that Tellabs' products infringed Fujitsu's patents. *Id.* at 465:11–17, 476:18–477:11. Mr. Rudofski's testimony speaks to a Catch-22 created by Tellabs: the only condition under which Tellabs would have agreed to negotiate with Fujitsu was if Fujitsu agreed that Tellabs was not infringing Fujitsu's patents. But if that were true, of course, no license would have been needed by Tellabs. Tellabs' position is accordingly nonsensical and could not be believed by any reasonable jury.

Mr. Rudofski additionally testified that he never obtained authority to resolve the dispute over the '737 Patent. *Id.* at 475:20–476:4. In fact, there is no testimony that Tellabs has ever agreed to license a patent, at a RAND rate or otherwise, for any implementation of G.692 despite the fact that numerous other companies have disclosed patents in connection with G.692. *Id.* at 481:25–482:14. Mr. Rudofski's statements to the effect that Tellabs has no obligation to consider patent infringement before offering infringing products on the market highlights

Tellabs' unwillingness to negotiate and its disregard of the rights of other patent owners. *Id.* at 495:18-21.

Tellabs' unwillingness to engage in licensing negotiations is confirmed by the testimony of Mr. Fuji, who was the primary spokesperson for Fujitsu during negotiations in 2007. Mr. Fuji testified that the purpose of Fujitsu's February 2, 2007 demand letter to Tellabs, Joint Ex. 5, was to negotiate a business resolution to Fujitsu's determination that Tellabs infringed Fujitsu's patents. Trial Tr., at 616:3–7. After completing technical discussions with Tellabs over the course of nine months, Mr. Fuji suggested a face-to-face meeting to discuss the licensing of Fujitsu's patents and "move to the next stage of negotiation." *Id.* at 628:23–629:18. Mr. Rudofski refused to participate in any more meetings after this request by Mr. Fuji. *Id.* at 629:11–13. Fujitsu was never able to present Tellabs with any license demand, RAND or otherwise, because Tellabs was unwilling and refused to negotiate, a fact pattern which is consistent with *Ericsson*, 2013 WL 4046225. *Id.* at 221:4–14 ("We were never given an opportunity to do so. Tellabs didn't want to get into discussions of that sort."); 663:15–17.

The testimony of both Tellabs and Fujitsu witnesses clearly establishes that as soon as Fujitsu attempted to begin discussing a license, Tellabs shut down negotiations. Fujitsu cannot be held responsible for Tellabs' refusal to engage in business discussions. As in *Ericsson*, Tellabs cannot rely upon its refusal to negotiate to prove that Fujitsu failed to make a RAND offer. No reasonable jury could find that Tellabs was willing to negotiate a license of any sort with Fujitsu, RAND or otherwise.

### E.     No reasonable jury could find that Fujitsu acted willfully.

Even if the Court determines that a reasonable jury could find a RAND obligation and breach thereof, no reasonable jury could find that Fujitsu's breach was willful. In the first

instance, Illinois law does not have a cause of action for willful breach of contract and therefore a jury cannot find one. *Morrow v. L.A. Goldschmidt Associates, Inc.*, 112 Ill.2d 87, 94-95 (1986). Notwithstanding that basic legal premise, Fujitsu's willfulness is a question of its corporate state of mind. Did Fujitsu know that the '737 Patent was standard-essential and intentionally breach the associated RAND obligation despite that knowledge? Tellabs failed to prove that Fujitsu believed the '737 Patent was standard essential in 2007 and 2008. Intentionality with respect to a RAND breach is not tantamount to the mere physical doing of an act itself; *i.e.*, filing a lawsuit. A jury in 2014 cannot retroactively impute knowledge of its finding of essentiality to Fujitsu in 2007. For a finding of willfulness, there must be evidence of an actual state of mind showing the necessary degree of calculated disregard for Tellabs' rights when Fujitsu filed suit against Tellabs. There is no such evidence because Fujitsu had no such willfulness.

An internal Fujitsu memorandum dated January 26, 2007 to Mr. Masanobu Katoh, Executive Managing Officer and General Counsel for Fujitsu (the "January 2007 Katoh Report") shows without question that Fujitsu did not believe the '737 Patent was standard-essential. Fujitsu Trial Ex. 50; Trial Tr., at 199:20-23, 316:4–13. In attachments to the internal, confidential memorandum, Fujitsu identified those patents it believed were standard essential and identified those patents in a separate chart. Fujitsu Ex. 51, at 51-5 (identifying other Fujitsu patents—but, critically, not the '737 Patent—as standard essential); *see also* Fujitsu Ex. 50, at 50-2 (discussing patents related to technology standard but not the '737 Patent). The '737 Patent is not listed as a patent related to standard technology in the January 2007 internal memorandum.

Tellabs' argument that Fujitsu never intended to offer a license to Tellabs and was only interested in filing a lawsuit could not be believed by a reasonable jury, as it does not comport with any evidence of record. The January 2007 Katoh Report, an internal memorandum created before Fujitsu sent its notice letter to Tellabs, is an internal document highly probative of Fujitsu's state of mind: it clearly states in the "Offer to License" section that Fujitsu, in fact, contemplated licensing its patents to Tellabs. Fujitsu Ex. 50, at 50-3. The fact that Fujitsu consulted with attorneys to understand its options when it appeared that the negotiations with Tellabs would not result in a license, which was confirmed when Mr. Rudofski rejected the invitation to meet after November 2007, does not contradict Fujitsu's interest in licensing patents to Tellabs, as stated in an internal memorandum.

On November 30, 2007, another report was submitted to Mr. Katoh (the "November 2007 Katoh Report"). The November 2007 Katoh Report demonstrates that Fujitsu initiated litigation as a last resort because Tellabs refused to engage in any discussions about licenses with Fujitsu. Tellabs Ex. 6, at FJ2946344 ("Tellabs refuses to meet face to fact and to present opinions in writing. Going forward, we believe it would be unlikely for them to be amenable to business discussions."). Again, in the November 2007 Katoh Report, Fujitsu employees refer to certain patents that Fujitsu believed to be standard-essential but never identified the '737 Patent as being standard essential. *Id.*

Tellabs apparently relied upon a single piece of evidence in an attempt to show Fujitsu's corporate state of mind regarding standard-essentiality of the '737 Patent: the Ericsson slide presentations. Tellabs Trial Exs. 10A, 11A, and 17A. But the Ericsson slide presentations could not convince a reasonable jury that Fujitsu believed the '737 Patent to be standard essential. In 2007 Fujitsu was approached by Ericsson regarding patent licensing and potential infringement

of Ericsson patents. Trial Tr., at 283:21-284:6. Fujitsu was subsequently on the defense in a series of negotiation meetings between Ericsson and Fujitsu. During these negotiations, Fujitsu used the Ericsson slide presentations to present an incomplete "mapping" of Claim 11 onto G.692, with which the Ericsson products allegedly complied. This incomplete mapping was intended to prompt Ericsson into either admitting or denying that the Marconi product performed the optical branching step of Claim 11. (Trial Tr., at 183:25-184:8.) Ericsson's response would in turn enable Fujitsu and Ericsson to value the '737 Patent in the context of the cross-license Fujitsu was seeking from Ericsson. Nothing in Fujitsu's use of the G.692 standard as a device for eliciting information from Ericsson about whether Ericsson products infringed the '737 Patent contradicts the fact that Fujitsu did not believe the '737 Patent was a RAND-obligated standard essential patent. Furthermore, at a January 2008 meeting, after Fujitsu had presented its incomplete mapping of the '737 patent onto the G.692 Recommendation, Fujitsu and Ericsson both concluded that the '737 patent was not standard-essential. Trial Tr. 292:9-14; 303:3-14; 305:17-19; TX 10, p. 42. This evidence is uncontroverted.

When the Ericsson-Fujitsu slide presentations are viewed in their totality, it is clear both Ericsson and Fujitsu recognized that the '737 Patent is not standard essential to any ITU Recommendation. *Id.*, at 292:5-14, and 667:6-13. The failed mapping of Claim 11 so heavily relied upon by Tellabs, rather than showing that Fujitsu believed the '737 Patent was standard essential, actually confirms that Fujitsu had no reason to believe the '737 Patent was standard-essential.

Regarding Fujitsu's knowledge of whether the '737 Patent was standard-essential, as Professor Simcoe testified, "an essential patent, in the language of many standard-setting organizations' policies, are those patents that are required to -- that are covered by the licensing

commitments made by companies … So I am trying to understand what version of essential --there is a lot of different versions of essential that have been used in the academic literature and in different standard setting bodies' definitions you are using."   Trial Tr., at 389:22-390:5.  Notwithstanding the Court's definition of "necessary" and "essential" as provided to the jury, Professor Simcoe's testimony clearly explains that such a definition *is not* the only or obvious definition.  It is undisputed that the '737 Patent is not the only way to implement ITU G.692 Recommendation.  There is no evidence Fujitsu knew in 1998, or 2007, or 2008, or 2014 that the Court would adopt the definition of "standard-essential" which was ultimately given to the jury.  There is no evidence Fujitsu knew Tellabs was using the '737 Patent to implement the G.692 Recommendation, which is key to establishing Fujitsu's knowledge of Tellabs known rights.  Without knowledge of the Court's definition of "standard-essential" and whether Tellabs was implementing G.692, Fujitsu could not have knowingly and consciously disregarded Tellabs' rights.

Tellabs' argument regarding Fujitsu's alleged "ill will" towards Tellabs is a smoke screen which a reasonable jury could not believe was related to a RAND breach.   The fact that Tellabs and Fujitsu vigorously competed with each other for business, and Fujitsu did not want to lose business to Tellabs is irrelevant to the question of willfulness, which depends on the corporate state of mind regarding knowledge of standard essentiality at the time Fujitsu was considering suing Tellabs in 2007 and 2008.

In 2007, Fujitsu expressly told Tellabs that it would license its standard essential patents to Tellabs.  Trial Tr., at 624:23–625:8.  The confidential, internal documents of Fujitsu show Fujitsu's corporate state of mind: Fujitsu did not, and does not, believe the '737 Patent was or is standard-essential and thus RAND-obligated.   Joint Ex. 5; Trial Tr., at 618:20–619:2.   The

evidence is clear that Fujitsu did not believe the '737 Patent was essential to the G.692 Recommendation. With this honest and reasonable belief, any RAND breach could not be willful, *i.e.*, intentional, knowing and with conscious disregard for Tellabs' known rights, and no reasonable jury could find otherwise.

## <u>CONCLUSION</u>

Fujitsu Limited respectfully requests that the Court grant its Renewed Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b) and enter judgment in favor of Fujitsu Limited and against Tellabs on Tellabs' affirmative defense of unenforceability of U.S. Patent No. 5,521,737.


Dated: August 20, 2014           Respectfully Submitted,

*/s/ David C. Van Dyke*

David C. Van Dyke

David C. Van Dyke // Joseph W. Barber
Emily E. Bennett

Howard & Howard Attorneys PLLC
200 South Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 456-3641
Facsimile: (312) 939-5617
Email: dvd@h2law.com
Email: jwb@h2law.com
Email: eeb@h2law.com

James C. Brooks // Michael D. Owens
Orrick, Herrington & Sutcliffe, LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017-5855
Telephone: (213) 629-2020
Facsimile: (213) 612-2499
Email: jbrooks@orrick.com
Email: mowens@orrick.com

Mark P. Wine //Mark J. Shean // Glen Liu
Orrick, Herrington & Sutcliffe, LLP
2050 Main Street, Suite 1100
Irvine, CA 92618
Telephone: (949) 567-6700
Facsimile: (949) 567-6710
Email:   mwine@orrick.com
Email:   mshean@orrick.com
Email:   gliu@orrick.com

*Attorneys for* **FUJITSU LIMITED**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2014, I provided service to all counsel by causing a true and correct copy of FUJITSU LIMITED'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(B) ON TELLABS' UNENFORCEABILITY AFFIRMATIVE DEFENSE to be served on all counsel of record by the Court's CM/ECF System.

Dated: August 20, 2014

_s/ David C. Van Dyke_
David C. Van Dyke (#6204705)
Howard & Howard Attorneys PLLC
200 South Michigan Ave. Suite 1100
Chicago IL 60604
Telephone: (312) 456-3641
Facsimile: (312) 939-5617
Email: dvd@h2law.com